599 A.2d 1207

**Ivan Antonio MEJIA**

v.

**STATE of Maryland.**

**No. 377, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Jan. 6, 1992.

Certiorari Granted April 28, 1992.

---

Bradford C. Peabody, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen., (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Andrew L. Sonner, State's Atty. for Montgomery County of Rockville, on the brief), for appellee.

Submitted before MOYLAN, GARRITY and ALPERT, JJ.

MOYLAN, Judge.

With this appeal, we encounter a second generation of issues spawned by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). As we move from the simple bi-polar world of black and white into the subtler grays, it becomes, as some predicted from the beginning, increasingly apparent that, at worst, we are irreversibly

adrift on a slippery slope with no foreseeable stopping place short of the elimination of the peremptory challenge. At best, we are sentenced to at least a decade of playing a diverting ethnological parlor game called "Who is What and How Do We Know It?" In either event, it behooves us to get down pat the rules of the slope or of the game.

When a party is allocated the burden of establishing a *prima facie* case as to a proposition, *establishing* the necessary set of predicate facts involves more than simply *proclaiming* those facts.[1] That is why, as we explained in *Bailey v. State*, 84 Md.App. 323, 326–327, 579 A.2d 774 (1990), *cert. denied*, 321 Md. 225, 582 A.2d 531 (1990), the constitutional law regulating the application of *Batson* to the use of peremptory challenges is:

"... carefully calibrated to guarantee that charges of racial discrimination, calling into play the full strictures of *Batson*, are neither carelessly indulged nor promiscuously invoked. This is why *Batson* requires that the appellant establish a *prima facie* case of discrimination at the threshold before full constitutional mobilization takes place. That is why the elaborate responses of *Batson* are not intended to be a knee-jerk reaction every time a charge of discrimination is laid."

The appellant, Ivan Antonio Mejia, was convicted by a Montgomery County jury, presided over by Judge Jerry H. Hyatt, of a second-degree sexual offense and of attempted rape in the second degree. Upon this appeal, he raises the single contention that Judge Hyatt erroneously ruled that he had failed to make out a *prima facie* case of a *Batson v. Kentucky* violation so as to put the State to its burden of giving an ethnically neutral explanation for its use of a peremptory strike.

---

1. It is not permitted to handle *Batson*'s ethnic phenomena as cavalierly as Justice Potter Stewart once handled "pornography" in *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793, 804 (1964): "[I can't define it,] but I know it when I see it ..."

*The Facial Legitimacy of the Claim*

We will restate the appellant's claim itself before assessing whether he has actually established any of the constituent facts that might give rise to it. The claim is that he, Ivan Antonio Mejia, is Hispanic; that a prospective juror peremptorily challenged by the State, Peter Estrada, was also Hispanic; that no other member of the array from which the jury was drawn was Hispanic; and that these premises establish a *prima facie* case that the peremptory strike of Estrada was *ipso facto* ethnically motivated in violation of *Batson.*

Although all of the reported appellate decisions in Maryland considering *Batson* claims have thus far involved peremptory challenges against blacks, the undergirding logic of Equal Protection law, on which *Batson* rests, compellingly requires that its strictures must also apply to peremptories used against any other cognizable group. Indeed, the most recent Supreme Court decision applying *Batson, Hernandez v. New York,* 500 U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), is a case where the peremptory challenges had been used against "Hispanics" or "Latinos." The Supreme Court did not even pause to question the applicability of *Batson* to such a target group.

Successful challenges to the use of peremptories have, moreover, been maintained in a number of state courts and lower federal courts with respect to a smorgasbord of cognizable target groups. These have included such groups as whites, *Roman v. Abrams,* 822 F.2d 214, 227–228 (2d Cir.1987); *People v. Gary M.,* 138 Misc.2d 1081, 526 N.Y.S.2d 986, 994 (N.Y.Sup.1988); *Gov. of Virgin Islands v. Forte,* 865 F.2d 59, 64 (3d Cir.1989); males, *United States v. De Gross,* 913 F.2d 1417 (9th Cir.1990); *Com. v. Reid,* 384 Mass. 247, 424 N.E.2d 495, 500 (1981); American Indians, *United States v. Chalan,* 812 F.2d 1302, 1313–1314 (10th Cir.1987); Italian–Americans, *United States v. Biaggi,* 673 F.Supp. 96 (E.D.N.Y.1987), *aff'd.* 853 F.2d 89 (2d Cir.1988); and French–Canadians with Gallic surnames, *Com. v. Gag-*

*non,* 16 Mass.App. 110, 449 N.E.2d 686, 691–692 (1983). *Dicta* in *Strauder v. West Virginia,* 100 U.S. 303, 308, 25 L.Ed. 664 (1880), is also instructive:

> "Nor if a law should be passed excluding all naturalized Celtic Irishmen [from jury service], would there be any doubt of its inconsistency with the spirit of the [14th] amendment."

In terms of what groups qualify for protection under the Equal Protection Clause and under the closely related Civil Rights Act of 1866, *see* the thoroughly researched and tightly reasoned opinions of *St. Francis College v. Al-Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), and *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987).

### The Allocation of the Burden

■ With respect to establishing a *prima facie* case of discrimination, that burden, as is always the case when one claims a violation of the Equal Protection Clause, is upon the party making the claim. *Batson v. Kentucky,* 476 U.S. at 93, 106 S.Ct. at 1721, 90 L.Ed.2d at 85, was unequivocal:

> "As in any equal protection case, 'the burden is, of course,' on the defendant who alleges discriminatory selection of the venire 'to prove the existence of purposeful discrimination.' "

As we explained in *Chew v. State,* 71 Md.App. 681, 694, 527 A.2d 332 (1987):

> "Initially, the burden is on the party claiming an equal protection violation to establish a *prima facie* case in that regard.
>
> .    .    .    .    .
>
> Absent the establishment of such a *prima facie* case, there is no obligation on the opposing party to offer any explanation for the use of a peremptory challenge and no entitlement on the part of the moving party to a hearing on the issue."

With respect to the specific and initial burden of showing a *prima facie* case, *Batson* made that burden significantly easier than had theretofore been the case under the regime of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Even though the burden was lessened, however, it was still clear that it rested squarely upon the party claiming the Equal Protection Clause violation. As *Batson* explained, 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87:

> "*[A] defendant may establish* a *prima facie* case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, *the defendant ... must show* that ...*"* (emphasis supplied).

A few sentences further along, the Supreme Court again unequivocally placed the burden upon the defendant:

> "In deciding *whether the defendant has made the requisite showing,* the trial court should consider all relevant circumstances." (emphasis supplied).

476 U.S. at 96–97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. In *Stanley v. State,* 313 Md. 50, 71, 542 A.2d 1267 (1988), Judge Adkins referred to this allocation and to its significance:

> "*It simply requires the defendant to prove* by a preponderance of the evidence that the peremptory challenges were exercised in a way that shifts the burden of production to the State and requires it to respond to the rebuttable presumption of purposeful discrimination that arises under certain circumstances." (emphasis supplied).

*Stanley* had earlier held unequivocally, at 313 Md. at 61, 542 A.2d 1267, "It is *the defendant's burden* to make that *prima facie* showing ..." (emphasis supplied). *State v. Gorman,* 315 Md. 402, 410, 554 A.2d 1203 (1989), was equally emphatic, "Initially, *the burden is on the defendant* to establish a *prima facie* case." (emphasis supplied).

### The Initial Judicial Ruling

Once the defendant moves that the State be required to justify its use of peremptories, the trial judge is called upon to rule whether he is satisfied "by a preponderance of the evidence," *Stanley v. State*, 313 Md. 50, 71, 542 A.2d 1267, that the defendant has established a *prima facie* case in that regard. If the judge is not so satisfied, the State, of course, is under no obligation to respond. The peremptories remains peremptory. In this case, the appellant moved:

"I am going to object to this on the grounds of the *Batson* case. We have an Hispanic defendant charged with raping a non-Hispanic or white woman. There is only one Hispanic person on the jury panel. The State has used its strike to strike that person.

There have been three strikes used by the State. Now there is this one and one earlier one that was used to strike a potential black juror.[2]

Basically, I am going to object to his strike on the surface as a racially motivated strike that is taking out the only Hispanic juror in a panel of 50 people."

Judge Hyatt was not persuaded that a *prima facie* case had been established, as he ruled with a minimum of excess verbiage:

"Motion denied."

It is from that ruling that this appeal has been taken.

### The Standard of Appellate Review

■ In reviewing either of a trial judge's possible decisions on a *Batson* issue—(1) whether a *prima facie* case of discrimination has been established, and (2) if so, whether an ultimate case of discrimination has also been established—appellate courts "do not presume to second-guess the call by the 'umpire on the field' either by way of *de*

---

**2.** What this immaterial observation had to do with the Hispanic issue there being raised is hard to figure. It comes across as a gratuitous "shot," suggesting, perhaps, that the Montgomery County State's Attorney's Office is biased against minorities generally.

*novo* fact finding or by way of independent constitutional judgment." *Bailey v. State,* 84 Md.App. at 328, 579 A.2d 774. *Batson* itself voiced its confidence in and deference to the trial judge's decision, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88:

> "We have confidence that trial judges, experienced in supervising *voir dire,* will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a *prima facie* case of discrimination against black jurors."

That recognition of the trial judge's special competence in monitoring the *voir dire* was echoed by *Stanley v. State,* at 313 Md. 60, 542 A.2d 1267:

> "The Supreme Court was confident that trial judges, experienced in supervising *voir dire,* would 'be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a *prima facie* case of discrimination against black jurors.'"

We ourselves examined the reasons for that deference in *Bailey v. State, supra,* at 84 Md.App. 328, 329, 579 A.2d 774:

> "It is the trial judge who is in close touch with the racial mood, be it harmonious or be it tense, of the local community, either as a general proposition or with respect to a given trial of high local interest. The trial judge is positioned to observe the racial composition of the venire panel as a whole, a vital fact frequently not committed to the record and, therefore, unknowable to the reviewing court. The trial judge is able to get the 'feel' of the opposing advocates—to watch their demeanor, to hear their intonations, and to spot their frequently unspoken purposes. It is a total process in which nonverbal communication may often be far more revealing than the formal words on the typewritten page. The standard of review, therefore, is perforce that of whether the trial judge's fact finding as to this threshold showing is clearly erroneous."

In *Hernandez v. New York, supra,* the Supreme Court was urged to adopt the standard of " 'independent' appellate review of a trial court's rejection of a *Batson* claim." —— U.S. at ——, 111 S.Ct. at 1869–70, 114 L.Ed.2d at 410. It rejected that standard in favor of the more deferential standard:

> "This case comes to us on direct review of the state court judgment. No statute or rule governs our review of facts found by state courts in cases with this posture. *The reasons justifying a deferential standard of review in other contexts, however, apply with equal force to our review of a state trial court's findings of fact made in connection with a federal constitutional claim.* Our cases have indicated that, in the absence of exceptional circumstances, we would defer to state court factual findings, even when those findings relate to a constitutional issue." (emphasis supplied).

*Id.*

### The Absence of a Pattern

■ Turning to the case at hand, we hold that Judge Hyatt was not clearly erroneous in remaining unpersuaded that a *prima facie* case of discrimination had been established and in not ordering, therefore, full constitutional mobilization. Again, we look to *Batson* itself for guidance. The most obvious evidence of discrimination, as it was even under the *Swain v. Alabama* regime, is systematic exclusion of a group. *Batson* explained, at 476 U.S. 94, 106 S.Ct. 1722, 90 L.Ed.2d 86:

> "[A] defendant may then make a *prima facie* case by proving that in the particular jurisdiction members of his [group] have not been summoned for jury service over an extended period of time.... Proof of systematic exclusion from the venire raises an inference of purposeful discrimination because the 'result bespeaks discrimination.' " (citation omitted).

Needless to say, there was no evidence remotely suggesting that the Montgomery County court system or the Montgom-

ery County State's Attorney's Office was engaged in any systematic exclusion of members of any group.

Under *Batson,* of course, it became possible for a party to establish a *prima facie* case of discrimination within the more limited factual context of a single case. *Batson* explained, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88:

> "[A] 'pattern' of strikes against [Hispanic] jurors included in the particular venire might give rise to an inference of discrimination."

In this case, of course, there was no *pattern.* Just as a single point cannot define a line and a single digit cannot constitute a series, a single action cannot spell out a pattern of action unless the word "pattern" is to be drained of all meaning. "One swallow does not a summer make."

Even a single peremptory strike, of course, when combined with other corroborating data, might *contribute* to proof of a purpose to discriminate. The modality of proof in such a case, however, based upon a combination of extrinsic things such as inferences drawn from the *voir dire* questioning itself, from purposes revealed through trial strategies, from clues as to agenda emanating from legal argument, etc. would be a different evidentiary modality and not one based upon showing a pattern. In this case, there was simply no predicate "pattern of strikes" from which an inference, permissible or impermissible, could even arise.

### The Absence of Alternative Proof

■ Even in the absence of a pattern, however, *Batson,* at 476 U.S. 97, at 106 S.Ct. 1723, at 90 L.Ed.2d 88, provides an alternative modality of proof:

> "Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose."

Here, just as there was no pattern, neither did the prosecutor ask any "questions" or make any "statements during *voir dire* examination" or in "exercising his challenges" that could possibly "support . . . an inference of discriminatory purpose." The assistant state's attorney asked no questions of anyone about anything. The *voir dire* questions propounded by Judge Hyatt, moreover, dealt only with such neutral matters as acquaintanceship with any of the parties or witnesses and with having any family members with law enforcement connections. Under either of the alternate modalities of proof, there was no *prima facie* case of a *Batson* violation.

We note incidentally that the prosecution used three of its ten peremptories, plus one to strike an alternate. (The defense used nine of its peremptories, plus one to strike an alternate). The prosecution struck three males and one female. If a passing remark made by appellant's counsel in argument may be the basis for an inference, the prosecution apparently struck three whites and one black. Beyond that, we would be reduced, as rank ethnological amateurs, to playing guessing games based upon surnames, even as trial counsel and the trial judge, had they chosen to indulge, would have been reduced to such rankly amateurish speculation. (Defense counsel, of course, did choose to indulge.)

If required to engage in such a game, however, one might conclude that the prosecution struck one woman, Ms. La-Grange, whose surname (or husband's surname) suggests a possible French, French–Canadian, or Cajun background; one man, Mr. Pakkianathan, whose surname suggests a possible Pakistani or Indian background; a second man, Mr. Estrada, whose surname suggests a possible European Spanish, European Portuguese, Hispanic, Brazilian, or Filipino background; and a third man, Mr. Lehman, whose surname suggests a possible German Jewish background. If *Batson v. Kentucky* were allowed to run amok, the prosecutor might be called upon, we suggest, to give a racially neutral, ethnically neutral, religiously neutral, and gender neutral explanation for any or all of these merely

arguable possibilities. Commendably, Judge Hyatt ruled that these random actions did not establish a *prima facie* case of anything. We affirm.

The inadequacy of the appellant's *prima facie* case, however, was more sweeping than the mere failure to show either 1) a pattern of strikes or 2) other evidence of a purpose to discriminate. As guidance to bench and bar and in an effort to limit to some extent the effluvia from Pandora's box, we are disposed to catalogue further those inadequacies.

### Who or What Is Hispanic?

In the absence of any guidance from the Supreme Court, we shall accept, at least tentatively, the appellant's definition of "Hispanic." [3] *Webster's New World Dictionary* (3d Col.Ed., 1988) defines the noun "Hispanic" as: "A usually Spanish-speaking person of Latin American origin who lives in the United States." In the *Statistical Abstract of the United States, 1990,* U.S. Dept. of Commerce, Bureau of the Census, at 17, the category "Hispanic" is listed as one of five categories of "resident population." The other four are 1) "white," 2) "black," 3) "American Indians and Alaska natives," and 4) "Asian and Pacific Islanders." It is, of course, the Latin American aspect of what the term gropes to describe that transformed the term "Hispanic" into a category at least partially connoting race—a term more or less contrasted with "white" or "black"—rather than an ethnic or national category such as "Gallic," "Teutonic," or "Slavic." In Latin America, a thin layer of Spanish language, Spanish religion, and Spanish culture was overlaid upon a predominantly Indian base.

It is apparently, therefore, not a term used to describe Spaniards from Spain, not a term that is somehow equiva-

---

**3.** Etymologically, "Hispanic" comes from "Hispania," the Latin name for the Roman province which was coterminous with what is essentially modern-day Spain. "Iberia," a geographic term, referred to the entire peninsula lying south and west of the Pyrenees. It embraced both "Hispania" and "Lusitania," modern-day Portugal.

lent to "French," "Italian," or "Norwegian." The *Statistical Abstract of the United States, 1990,* goes on at pp. 4–5 to state that "Hispanic persons," in the Current Population Survey, "were persons who reported themselves as Mexican–American, Chicano, Mexican, Puerto Rican, Cuban, Central or South American (Spanish countries), or other Hispanic origin." "Spanish" appears to be a term contrasted with "Hispanic" rather than being a sub-set included within it.

It appears, therefore, that the salient characteristics one should possess for qualifying as an Hispanic are 1) having Spanish as one's native language, 2) having a Spanish surname, and 3) being of Latin American origin. With this candidly amorphous and imprecise definition, we turn to the players in the jury selection process now under our scrutiny.

### Was the Appellant, Ivan Antonio Mejia, Shown to be Hispanic?

It was clear that the appellant was a Spanish-language speaker who needed the benefit of an interpreter. We will assume that "Mejia" is a Spanish surname. (The Christian name "Ivan" might raise some eyebrows). These two characteristics do not alone establish, however, that one is necessarily an Hispanic. The majority of 39 million Spaniards have Spanish as their native language and have Spanish surnames and yet are apparently not Hispanic. So do a significant percentage of 58 million Filipinos, who are clearly not Hispanic. If Imelda Marcos and Corazon Aquino do not qualify as Hispanics, neither their native language nor their surnames would prove it.

If the appellant is, indeed, Hispanic, it would have been very easy for appellant's counsel to have established that fact. The burden of establishing it, however, is squarely upon the appellant and a part of that burden is the making of an adequate record. *Parker v. State,* 72 Md.App. 610,

617, 531 A.2d 1313 (1987). As Judge Adkins pointed out in *Stanley v. State, supra,* at 313 Md. 70 n. 11, 542 A.2d 1267:

"We emphasize here the need for the record to contain not only specific findings by the judge, but also information to support those findings; information such as the ... pertinent characteristics of jurors excluded and retained, relevant information about the race of the defendant, the victim, and potential witnesses, and so forth."

In terms of Hispanic status, how may we be reassured that the appellant was not actually from Barcelona instead of Mexicali? Or from Manila? And whose job was it to tell us?

■ Any failure to show that the appellant was Hispanic, however, would not be fatal to the appellant's cause. It is now clear that one does not have to be Hispanic to raise a *Batson* challenge to the striking of Hispanic jurors. *Powers v. Ohio,* 499 U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

*Was the Juror, Peter Estrada, Shown to be Hispanic?*

■ The Hispanic credentials of the peremptorily challenged Peter Estrada are far less substantial than even those of the appellant. When Judge Hyatt asked the jurors whether any of them understood Spanish, none, including Estrada, responded affirmatively. The only evidence was that Estrada did not speak Spanish. Appellant's counsel nonetheless boldly proclaimed him to be Hispanic—on the basis of nothing but his surname. Appellant's counsel offered neither evidence nor casual observation in support of this assertion. Nor did he proffer any basis for his own expertise in such matters.

Even accepting, *arguendo,* that "Estrada" is a Spanish surname, Spanish surnames are enjoyed not only by Latin Americans but also by the vast majority of 39 million Spaniards, who are apparently not Hispanic, as well as by a significant percentage of 58 million Filipinos, who are definitely not Hispanic. Spanish surnames, furthermore, are

enjoyed both by the vast majority of 10 million Portuguese, who are not Hispanic, and by 143 million Brazilians, who are also not Hispanic. In terms of Estrada's suspect status as a non-Hispanic, not only has the appellant failed to allay our fears that Estrada (or his father or his grandfather) might originally have hailed from Barcelona or from Manila, there are additional unallayed fears that he (or they) might have hailed from Lisbon or from Rio de Janeiro.

A Spanish surname alone is not simply a slender reed, it is an inadequate reed to support Hispanic status. If the President of Peru, Alberto Fujiwara—Peruvian born, Spanish-speaking but of Japanese ancestry—is, indeed, Hispanic, his surname will not prove it. If, on the other hand, Benjamin Nathan Cardozo, Benjamin Disraeli, and Baruch Spinoza were non-Hispanic, their surnames will not prove it. Appellant's counsel's bold assertion that Peter Estrada is Hispanic is nothing more than bold assertion. There was no adequate establishment of this as a fact.

### Was the Rest of the Jury Panel Shown to be Non–Hispanic?

Once again, appellant's counsel boldly and broadly proclaims that except for Peter Estrada, the rest of the jury panel was non-Hispanic. His goal was to show that the State had struck the only Hispanic juror available to try the Hispanic appellant. Except for counsel's self-serving *ipse dixit* in this regard, however, there was no basis for such a conclusion with respect to the rest of the panel. From the jurors, including alternates, who were accepted or challenged, we can comb the record and come up with the surnames of 28 members of the 50–person panel. With respect to the other 22, however, there is nothing in the record to give us even the surnames, let alone any information beyond the names. For all we know, they may all have had Spanish surnames. Again, the burden of making a record was upon the appellant.

With respect to the 28 jurors whose surnames we can discover, moreover, that knowledge alone tells us little.

Presumably, half of the jurors were women. How do we know that they were not all born Hispanic but are now using the names of their non-Hispanic husbands? Did Rita Cansini, for instance, cease to be Hispanic on the day she assumed the name "Rita Hayworth?" Did Lucille Ball, on the other hand, become Hispanic whenever she traveled as "Mrs. Desi Arnaz?"

In combing the record, moreover, we note that one of the jurors peremptorily struck by the appellant was Jean Porto. If "Porto" is not an Hispanic surname and it may not be, we are still not sure why we should so conclude.

Particularly in the melting pot of the United States and particularly when looking at second and third generation Americans, the foolishness of basing ethnic assumptions on surnames alone is self-evident. Posit the case of two Irish–American twins, Robert and Mary Martin, growing up as the next-door neighbors of two Mexican–American twins, Roberto and Maria Martinez. If Robert Martin marries Maria Martinez and his sister Mary Martin marries Roberto Martinez, are the Martinez children Hispanic and the ethnically indistinguishable Martin children non-Hispanic? On the day of their mutual wedding, did Mary Martin and Maria Martinez pass the mantilla, with Mary Martin Martinez becoming Hispanic even as Maria Martinez Martin became non-Hispanic? Or were they both thenceforth Hispanic? And what shall happen in terms of future ethnic status when their daughters move away to Minnesota to marry Swedish lumberjacks? How many times may the "bloodline" be diluted before ethnic status evaporates? Or does ethnic status simply follow the male surname *ad infinitum*? There is something terribly arbitrary and imprecise about all of this; yet this is exactly the sort of unsubstantiated labeling the appellant sought to pawn off upon the court.

Unless tightly restrained, *Batson v. Kentucky* could easily degenerate into an ethnic parlor game. While it may be an interesting diversion for the parlor, it is not, when breezily invoked, a sound basis for reversing judicial judg-

ments. This is why, as we pointed out in *Bailey v. State*, at 84 Md.App. 326–327, 579 A.2d 774, procedural discipline must be maintained to make certain that:

"... the elaborate responses of *Batson* are not ... a knee-jerk reaction every time a charge of discrimination is laid."

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.