627 A.2d 44

**Gary GILCHRIST**

v.

**STATE of Maryland.**

**No. 1594, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

July 6, 1993.

Certiorari Granted Nov. 23, 1993.

56

Nancy M. Cohen, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

David R. Durfee, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Submitted before WILNER, C.J., BLOOM and JOHNSON, JJ., and G.R. HOVEY, Judge, Specially Assigned.

Opinion by BLOOM, Judge.

In this appeal we are asked to determine whether the trial court erred in striking the jury panel and beginning jury selection anew based on a finding that defense counsel had used peremptory strikes for a racially biased purpose. The facts of this case distinguish it from other instances of racial prejudice. We are convinced by the Supreme Court's decisions in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *Georgia v. McCollum*, —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), and this Court's decisions in *Mejia v. State*, 90 Md.App. 31, 599 A.2d 1207, *vacated and remanded*, 328 Md. 522, 616 A.2d 356 (1992), and *Brashear v. State*, 90 Md.App. 709, 603 A.2d 901, *cert. denied*, 327 Md. 523, 610 A.2d 796 (1992), to conclude that the trial court correctly dismissed the jury panel. Accordingly, we affirm the lower court.

### *Facts*

The appellant, Gary Gilchrist, was charged with distribution of cocaine and possession of cocaine with intent to distribute. He was tried before a jury in the Circuit Court for Baltimore City, the Honorable Ellen M. Heller presiding, on August 3rd and 4th of 1992. Appellant was convicted of both charges and sentenced to concurrent terms of five years imprisonment. From this conviction he now appeals.

During the jury selection process, the prosecuting attorney, Ms. McNamara, expressed her concern that defense counsel was exercising the use of her peremptory strikes in a racially biased manner. The following colloquy occurred between the court and counsel:

MS. STEPHENSON: Your Honor, may we approach?

THE COURT: Yes.

(Counsel and the defendant approached the bench, and the following ensued:)

THE COURT: Do you want to try to get that juror back who was just excused? Yes?

MS. McNAMARA: I don't know the name of the case, but it is the case that came down after *Basso* which indicates that there are—there is no right to any racially motivated strikes. And every strike so far exercised by the defense counsel has been of white jurors.

Some of those jurors have not answered questions so it cannot be based on the fact that they gave answers that would indicate—

THE COURT: Which juror are you questioning or do you want to go through a reason for each of them?

MS. McNAMARA: For each one.

THE COURT: All right. That's seven jurors you've struck. They were all white. Let's go through them one by one and give me the reasons you struck them.

Juror number one?

MS. STEPHENSON: She is a victim of a crime, Judge.

THE COURT: What crime?

MS. STEPHENSON: She's the victim of a robbery, a store was held up.

MS. McNAMARA: Excuse me—

THE COURT: Her parents?

MS. STEPHENSON: Right. Parents and grandparents.

MS. McNAMARA: Do you want me to address them as we go through them?

THE COURT: I appreciate it.

MS. McNAMARA: Your Honor, as to Juror Number One, there was no—she was one of many people who indicated that she was the victim of a crime. Also after questioning she indicated that could be fair and there was no request to strike her for cause at the time that we were at the bench initially.

THE COURT: Well, that's right. But what I do for cause is still different from what she does for peremptory. Although I wouldn't see it reason for cause.

I don't think even with the latest decision you need a cause. You just cannot have a racially discriminatory reason for striking someone.

MS. McNAMARA: I'm just putting—

THE COURT: That doesn't mean you can't strike for your own reasons.

MS. McNAMARA: I'm just putting my reasons on the record.

THE COURT: Okay. Until the day they say that we do [away] with peremptories—and we're almost there—I cannot—you strike for your cause as long as it's not a discriminatory, unconstitutional reason. But we'll go through—all right.

MS. STEPHENSON: Can I just ask one question before we go on?

THE COURT: Yes.

MS. STEPHENSON: What is the remedy for this, a new panel?

THE COURT: Well, it might be just that.

MS. STEPHENSON: It's really rather interesting.

THE COURT: It is true that of seven jurors you struck, they were all white.

MS. STEPHENSON: I understand that is true.

THE COURT: So let's go through them.

MS. STEPHENSON: But the record should reflect the first three—six—the first six jurors on the first page are all white. The next—and then the next three were black and the next one was white. That's on the first page.

THE COURT: All right. But now that the call has been made, I've got to, in the first instance, make a decision—

MS. STEPHENSON: Okay.

THE COURT: —whether or not your reason was discriminatory because of an individual's race. I mean, that's what the cases say.

MS. STEPHENSON: That's true, Judge. But I want the record to reflect that the majority of the jurors that were

presented to me were, in fact, white. There have been very few black jurors that have been called up.

THE COURT: But as I understand the case law, that's [sic] still might have it. The circumstances and the context might explain, but we've got to go through them one by one.

MS. STEPHENSON: Okay.

THE COURT: The next juror in numbers of where they were seated, not the numbers of who you struck, was Juror Number—Summons Number 117, Juror Number Three, you struck.

MS. STEPHENSON: Judge, I personally, by looking at her—I see jurors in the box and I look at the way they relate to each other.

THE COURT: Well, how did she look?

MS. STEPHENSON: She looked—she reminded me of my Catholic school teacher that I didn't particularly like, and I didn't particularly—

THE COURT: I don't find that was a valid reason.

MS. STEPHENSON: Well, that's why I struck her, Judge.

THE COURT: She looked like your Catholic school teacher?

MS. STEPHENSON: Her look in the box at the other people who were in the box.

THE COURT: That's not a satisfactory explanation. Now, let's continue.

MS. STEPHENSON: Well, that's why I struck her.

THE COURT: Did you not like your Catholic school teacher, Ms. Stephenson?

MS. STEPHENSON: Not that particular one she reminded me of.

THE COURT: All right. Let's go through them. The next one I have is Juror Number Five, Summons Number 122.

MS. STEPHENSON: I thought, Judge, he was young. I didn't think particularly he would be a strong juror for my case by looking at him.

THE COURT: And why was that?

MS. STEPHENSON: Because I look at the way he fits into the persons that are on the panel. And what I'm trying to accomplish from the look of him, from the way he sat—

THE COURT: Well, how did he look from the way he was sitting that made you feel he was not good, other than the fact he was white and young?

MS. STEPHENSON: Well, he—number one, most of the jurors would look at my client and look over at the table. He was just sitting there not relating to anything in the room.

THE COURT: Because he wasn't relating to your client?

MS. STEPHENSON: Not relating to anything or anyone in the room. Frankly, I don't think he even wanted to be here.

THE COURT: I don't think that's a satisfactory explanation either. Let's continue. Juror Number Nine who was Summons Number 131 was also struck by you.

MS. STEPHENSON: 131?

THE COURT: Summons 131, Juror Number Nine, was also struck by you.

MS. STEPHENSON: Okay. Her brother—

THE COURT: It was a him. It was Juror—Summons Number 131.

MS. McNAMARA: On the bottom of the first page.

MS. STEPHENSON: 131. I'm sorry.

THE COURT: Juror Number Nine.

MS. STEPHENSON: I believe this is the young man who—was it Juror Number Nine?

THE COURT: Juror Number—Summons Nine—Summons 131, Juror Number Nine.

MS. STEPHENSON: Okay. My client looked over at him. He said—my client said he was acting kind of peculiar.

THE COURT: How?

MS. STEPHENSON: I don't know. I didn't.

THE DEFENDANT: He stared at me.

THE COURT: He stared at you?

THE DEFENDANT: He stared at me.

THE COURT: And he made you feel uncomfortable when he stared?

THE DEFENDANT: When he stared at me.

THE COURT: All right. At your client's request then you struck the juror?

MS. STEPHENSON: Yes.

THE COURT: I find that's an acceptable reason. You may continue. Let's go.

Juror Number 137 was also struck by the defense. I don't have the number down of what that juror was in the box.

MS. McNAMARA: 137. He never got to the box.

MS. STEPHENSON: No. He never got to the box.

THE COURT: He never got to the box. He was struck then. All right. Then the next one that got to the box that you struck I believe was 143.

MS. McNAMARA: She did not get to the box either.

MS. STEPHENSON: She was held up at gunpoint.

THE COURT: Oh, she wasn't in the box. I'm trying to—

MS. McNAMARA: Those were all that were in the box.

THE COURT: One—

MS. McNAMARA: Four in the box.

THE COURT: And the others were not in the box?

MS. McNAMARA: Correct.

THE COURT: Well, so let's go through—are you challenging those as well.

MS. McNAMARA: I'm not challenging—I believe there's a basis for striking 143. She was robbed at gunpoint.

THE COURT: All right. Well, let's go through them one by one. Juror Number—

MS. McNAMARA: 137

MS. STEPHENSON: —137 was struck why?

MS. STEPHENSON: By me.

THE COURT: Why?

MS. STEPHENSON: Oh, why? He was—I don't have anything written on here.

THE COURT: Let the record reflect he was a young white male in a navy blazer and khaki slacks.

MS. STEPHENSON: I believe he was—I remember him, Judge, and he was struck for the very [sic] we say was unacceptable.

THE COURT: And why was that?

MS. STEPHENSON: The other young man. There was another young man who was—

THE COURT: Well, what was wrong Juror Number— Summons 137?

MS. STEPHENSON: His clothing, his manner.

THE COURT: Well, what was wrong with his clothing and his manner?

MS. STEPHENSON: Well, his manner and his clothing suggest to me—

THE COURT: I—

MS. STEPHENSON: Let me finish. Suggest to me that he wouldn't be able to relate to my client because in this particular case there are—there is the police officer's word against my client's word. My client may very well testify. And because of those things—

THE COURT: Well, how do his clothing have anything to do with it? I don't make the connection.

MS. STEPHENSON: The clothing, Judge, means when you go to Brooks Brothers and buy a suit, and maybe not the suit—

THE COURT: The people who go to Brooks Brothers are more likely to believe police than defendants; is that what you're saying?

MS. STEPHENSON: Not necessarily so. But given the little information I have about them, I must make judgments about these individuals.

THE COURT: Well, what—well, all right. That's right. So what information did you have about Summons Number 137 that required you to strike him?

MS. STEPHENSON: Number 137, he's a student. We don't know what he's studying—

THE COURT: Well, we could have asked him.

MS STEPHENSON: Well, some courts don't let you bring them up and ask them.

THE COURT: But you didn't ask.

MS. STEPHENSON: He seemed rather studious.

THE COURT: Well, so what if he's studious? He's 21 years old.

MS. STEPHENSON: That's right. He has 16 years of education.

THE COURT: Right.

MS. STEPHENSON: That means he's done his college.

THE COURT: Right.

MS. STEPHENSON: And I'm not sure what his address. But for those reasons, Judge,—

THE COURT: That's an unacceptable reason.

MS. STEPHENSON: Those are my reasons.

THE COURT: I mean, that's no reason at all. You're just citing his biography and saying those are reasons.

MS. STEPHENSON: I have nothing else. Is the Court saying I can't strike him at all because—

THE COURT: The Court is saying you have to, when you have struck seven jurors, potential jurors,—

MS. STEPHENSON: Right.

THE COURT: —and they are all white and they all have different profiles, you're going to have to come up with a satisfactory explanation that persuades me that your reason for striking him was not racial. I mean, that's what the case law is saying.

MS. STEPHENSON: I know, Judge. But I haven't said anything to you now that would suggest that the reasons were racial. Nothing.

THE COURT: Well, I'm not quite sure.

MS. STEPHENSON: I mean,—

THE COURT: When you say that someone comes in a navy blazer and khaki slacks, and because he's a student and because of his address that's reason for striking him—

MS. STEPHENSON: I said I don't know anything about his address because I don't know the address. But, Judge, that could have been a black man. Are we saying that black men don't wear blazers and khaki pants?

THE COURT: All right. That's—I don't buy that as a satisfactory explanation.

MS. STEPHENSON: Very well.

THE COURT: The next juror was 143. What was the reason for striking that juror? 143.

MS. STEPHENSON: I thought we'd gone through seven already. 143. Held up at gunpoint?

THE COURT: Because it was a victim?

MS. STEPHENSON: Yes.

THE COURT: All right. I'll accept that reason.

MS. STEPHENSON: Yes.

THE COURT: Right. Okay. The next juror you struck was Juror Number 155.

MS. STEPHENSON: Unfortunately, I don't remember this gentleman. Did he get—

THE COURT: It's not a he. Juror Number 155.

MS. STEPHENSON: Judge, I don't remember her.

THE COURT: Okay. Well, that's not a satisfactory reason at all. They're not adequate reasons. I'm not saying that I'm finding that the public defender has struck these individuals for race or race alone. She did give satisfactory explanations for Juror Number 9 and Juror Number 137 who are victims.

On the other hand, the other people she's struck, all of them are white, none of them have particular profiles. She hasn't seemed to come up with adequate answers.

I'm going to leave it up to the State. If the State wants me to begin anew, I'll begin right now anew. I also don't know, now that you've raised the objection, even if you don't want me to begin anew, what that does to the taint of the jury panel down the line if he is convicted and appeals.

And if an appellate court decides that this was not a jury that was unbiased whether they on their own would strike it. I really don't know what you want me to do.

MS. McNAMARA: Well, Your Honor—

THE COURT: Having waited until this point in time, and I understand you waited until you saw the numbers, I'm in a predicament and I almost feel like we have to begin all over again.

MS. McNAMARA: And I want to say a couple of things for the record, too, in reference. I would indicate that there are several members of the jury panel who are black who had no profiles provided.

They were young. They were black. One especially was unemployed. They weren't struck. And so I believe that based on that, the theory that their profiles was enough is not adequate and is in direct contradiction to people who the defense counsel has left on the jury panel.

And I would indicate that also I believe that I'm not in any way calling her a racist, but it is racist to think that because someone is white and well-dressed they cannot relate to your client's predicament.

MS. STEPHENSON: That's not what I said.

THE COURT: Well, I think we're not going to get to the philosophy of it. I don't think that's what she said. There is a case down. The case was quite divided by the Supreme Court because there were legitimate reasons to divide it.

There are a whole party of people who would think it's not discriminatory and it's quite legitimate to try to have a jury panel that reflects the type of defendant that's on it. Because those people would say that that's more empathetic and understanding of the defendant; and, therefore, in that sense race is important, but we're using it deliberately.

There's a whole other group, and they were the majority of the Supreme Court, that came out saying that race is not something that can be taken into consideration for discriminatory reasons when you're selecting a jury. And I'm bound by that precedent.

I think I'm bound to excuse this whole panel and start anew.

MS. STEPHENSON: Let me state for the record, though, Judge, so that the record is now clear, Juror Number—I have three strikes left and I intended to strike a black person that I'm looking at.

THE COURT: But that—

MS. STEPHENSON: Now, I want the record to be clear because the State just put something in the record. She does not know if I intend to strike a black or not strike a black.

THE COURT: Well, she can't—we can't do on [sic] what you intend to do. We can only do on your record. You struck seven people, all white.

MS. STEPHENSON: But I still have three blacks— three—three strikes left. Another thing, Your Honor, a lot of young white ladies are on the panel that I have not struck.

And I want the record to reflect that this panel when it came—the first—and I said it before, and we should go through the sheet. The first three—six persons were white. The next one was—the next three were black. The next one on the first page was black.

Then the next one, two, three people on the second page were white, one black and one, two, three white

jurors, one black, one white, and the next three I have as black. And I have a question mark by the other one.

THE COURT: I understand that. I can only go by these things, though.

MS. STEPHENSON: This panel has been—was—the majority of the persons that were called up initially were all white. Most of them were white.

THE COURT: All right. And Ms. Stephenson, I have given you a chance to individually go over your reason for striking these people. And except where I indicated otherwise the people were victims of offenses and one time where your client said he didn't like the way someone stared, and I thought those were legitimate.

I did not find—

MS. STEPHENSON: I said someone stared at me, too, and you said that was not legitimate.

THE COURT: Well, you—

MS. STEPHENSON: I didn't like the guy's suit—

THE COURT: Can I finish?

MS. STEPHENSON: —they were students, and you said that was racial. I don't understand that, Judge. When he says he doesn't like it, it's fine. But when I do, it's racial?

THE COURT: I have not found satisfactory explanations for the other strikes. Therefore, we're going to begin all over again, because it's too late for me to continue otherwise.

I'm really concerned now about the panel. I really don't find any other remedy but to begin right now and go forward.

And just—I think we're almost going to have to do it after lunch. It's 12:10. I'm going to have to bring you all back at 1:30 and start a jury panel then. I mean, I don't know what else to do.

MS. McNAMARA: Thank you.

MS. STEPHENSON: That's the only remedy, I suspect.

THE COURT: Okay.

(Counsel and the defendant returned to the trial tables, and the following ensued:)

THE COURT: Members of the jury panel and members of the jury, I appreciate your patience as we conferred up here at the bench.

For reasons that I discussed with counsel up here at the bench, your services in this case will not be needed and, thus, I'm going to excuse all of you, the people in the box and the people here in the room to go back down to the jury assembly room.

I'd appreciate counsel staying where they are.

The jurors in the box and the panel are excused. Thank you. Go back downstairs.

Appellant now claims that the trial court erred in striking the first jury panel. We disagree and, accordingly, affirm.

## Reviewability of Alleged Error

Appellant contends that the trial court erred as a matter of law in dismissing the first jury panel and that the dismissal further prejudiced appellant by chilling defense counsel's use of peremptory strikes. Appellant's argument is two pronged. He argues that the Equal Protection Clause permits white jurors[1] to be struck from a jury panel based upon race and that the court erred in finding that defense counsel had used peremptory strikes to discriminate against prospective white jurors.

First we address appellee's contention that this issue is not preserved for our review. It is generally true that once a party "has previously made an objection with regard to a prospective juror or jurors, and thereafter, at the conclusion of the jury selection process, unequivocally states that the jury as selected is acceptable, such party had withdrawn or aban-

---

1. For convenience we shall employ the term "juror" rather than the proper term "prospective juror" or "venireperson."

doned his prior objection," *Foster v. State*, 304 Md. 439, 450–51, 499 A.2d 1236 (1985), *recons. denied*, 305 Md. 306, 503 A.2d 1326 (1986), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). Nevertheless, the situation that we are now contemplating is markedly different. Defense counsel offered explanations for her choosing to strike seven prospective white jurors—her explanations as to four prospective jurors were deemed inadequate by the court. The court determined that it was bound to excuse the entire panel and begin the jury selection process over again. Because the selection process was renewed in its entirety defense counsel did not waive the right to allege error in the dismissal of the first panel. Instead, the selection of the second panel was treated as a wholly separate process. Appellant claims that the trial court erred in ruling as a matter of law that the first panel be dismissed and a second jury impaneled. This alleged error was not waived by acceding to the court's ruling that it would impanel a new jury—the fact that counsel found the second jury panel to be acceptable has no bearing on whether prejudicial error occurred in dismissing the first panel. We shall address the merits of the case.

*Exercise of Peremptory Challenges to Exclude White Jurors*

The Supreme Court established in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." *Id.* at 89, 106 S.Ct. at 1719. "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Id.* at 86, 106 S.Ct. at 1717. Justice Powell noted that discriminatory jury selection harms the general community by undermining the public's confidence in our system of justice. *Id.* at 87, 106 S.Ct. at 1718.

This holding was extended to include the exercise of peremptory challenges by the defense as well as by the prosecution in *Georgia v. McCollum*, —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). *See also Edmonson v. Leesville*

*Concrete Co.,* —— U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (Equal Protection Clause is violated by a civil litigant's exercise of racially discriminatory peremptory challenges). The Supreme Court has generally defined peremptory challenges as follows:

> [P]eremptory challenges are not constitutionally protected fundamental rights; rather, they are but one state-created means to the constitutional end of an impartial jury and a fair trial. This Court repeatedly has stated that the right to a peremptory challenge may be withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair trial.

*McCollum,* —— U.S. at ——, 112 S.Ct. at 2358 (citations omitted). The Court's analysis in *McCollum* addressed four specific issues: (1) whether the exercise of peremptory challenges by a criminal defendant in a racially discriminatory manner produces the harm identified in *Batson,* (2) whether the exercise of peremptory challenges constitutes state action, (3) whether prosecutors have standing to raise a constitutional challenge to the racially motivated use of peremptories, and (4) whether the constitutional rights of criminal defendants preclude the extension of the *Batson* holding. In the majority opinion Justice Blackmun acknowledged that discriminatory jury selection meets the first *Batson* criteria because it threatens public confidence in the administration of justice:

> Be it at the hands of the State or the defense, if a court allows jurors to be excluded because of group bias, it is a willing participant in a scheme that could only undermine the very foundation of our system of justice—our citizens' confidence in it.

*McCollum,* —— U.S. at ——, 112 S.Ct. at 2354. In concluding that a criminal defendant's exercise of peremptory challenges constitutes state action under the Equal Protection Clause the Supreme Court reasoned that the criminal defendant relies upon "governmental assistance and benefits" equal to those in the jury selection of a civil case. *See Edmonson,* —— U.S. at ——, 111 S.Ct. at 2084. *See also McCollum,* —— U.S. at ——, 112 S.Ct. at 2357 n. 10, discussing other commentators' conclu-

sions. The jury functions in the governmental capacity of guardian of individual rights. *Edmonson,* —— U.S. at ——, 111 S.Ct. at 2085. The Court rationalized the extension of this doctrine to criminal defendants in part because of the governmental significance in jury selection:

> The exercise of a peremptory challenge differs significantly from other actions taken in support of a defendant's defense. In exercising a peremptory challenge, a criminal defendant is wielding the power to choose a quintessential governmental body—indeed, the institution of government on which our judicial system depends. Thus, as we held in *Edmonson,* when "a government confers on a private body the power to choose the government's employees or officials, the private body will be bound by the constitutional mandate of race neutrality."

*McCollum,* —— U.S. at ——, 112 S.Ct. at 2356 (citations omitted).

The Court further reasoned that a prosecutor, while asserting the rights of excluded jurors, has standing to attack the constitutionality of a defendant's racially discriminatory use of peremptory challenges, in part, because the excluded jurors are unable to do so. *Id.* at ——, 112 S.Ct. at 2357. Addressing the fourth prong of the analysis, the Court suggested that the proliferation of racial stereotypes is too high a price to pay for the protection of a defendant's constitutional rights. Justice Blackmun noted that the prohibition against discriminatory peremptory challenges does not violate a defendant's Sixth Amendment right to effective assistance of counsel or the confidential communications protected by the attorney-client relationship. *Id.* at ——, 112 S.Ct. at 2358. The Court ultimately concluded that the exercise of peremptory challenges in a racially discriminatory manner by a criminal defendant is unconstitutional:

> We hold that the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges. Accordingly, if the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants, must ar-

ticulate a racially neutral explanation for peremptory challenges.

*Id.* at ——, 112 S.Ct. at 2359.

The Court of Appeals and this Court have applied *Batson* on numerous occasions. *See State v. Gorman,* 324 Md. 124, 596 A.2d 629 (1991) (prosecutor's use of peremptory challenges to exclude black venirepersons was discriminatory; remanded for prosecution to offer race neutral reasons for use of challenges); *Chew v. State,* 317 Md. 233, 562 A.2d 1270 (1989) (remanded for new trial because prosecutor failed to articulate satisfactory nondiscriminatory reasons for using peremptory challenges to exclude black jurors); *Gray v. State,* 317 Md. 250, 562 A.2d 1278 (1989) (trial court did not abuse its discretion in refusing to allow prosecutor to be cross examined regarding his reasons for using peremptory challenges); *Tolbert v. State,* 315 Md. 13, 553 A.2d 228 (1989) (prosecutor failed to articulate a legitimate, clear, and reasonable explanation for striking potential black jurors); and *Stanley v. State,* 313 Md. 50, 542 A.2d 1267 (1988) (exercise of peremptory challenges to remove eight potential black jurors meets prima facie test so that limited remand was necessary to determine whether challenges were made with a discriminatory purpose). In *Mejia v. State,* 328 Md. 522, 616 A.2d 356 (1992), the Court of Appeals held that the defendant, a Hispanic, established a *prima facie* case of discrimination by the prosecutor in his exercise of peremptory challenges when he struck the only Hispanic in the venire. *See also Hernandez v. New York,* —— U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). The Supreme Court is now considering whether gender may serve as a basis for discrimination within the *Batson* ruling. *See, J.E.B. v. T.B.,* 606 So.2d 156 (Ala.1992), *cert. granted,* —— U.S. ——, 113 S.Ct. 2330, —— L.Ed.2d —— (1993) (father challenged use of peremptory strikes to exclude male jurors in paternity suit). *See also Tyler v. State,* 330 Md. 261, 623 A.2d 648 (1993) (use of peremptory challenges to exclude women from juries violates the Maryland Equal Rights Amendment and Maryland equal protection guarantees).

Appellee argues that the *Batson/McCollum* analysis is not applicable to the discriminatory removal of whites from a venire panel. The use of peremptories to remove potential white jurors has been challenged and found to be discriminatory in a number of other jurisdictions. *See Roman v. Abrams,* 822 F.2d 214, 227–28 (2d Cir.1987), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1311, 103 L.Ed.2d 580 (1989); *People v. Gary M.,* 138 Misc.2d 1081, 526 N.Y.S.2d 986, 994 (N.Y.Sup.1988); and *Government of Virgin Islands v. Forte,* 865 F.2d 59, 64 (3rd Cir.1989). In *Roman* the Second Circuit held that a prosecutor's use of peremptory challenges to exclude whites from the jury panel violated the defendant's Sixth Amendment right to trial by jury. *Roman,* 822 F.2d at 227–28. Similarly, the Third Circuit concluded in *Forte* that the exercise of peremptory challenges to remove all whites from the jury constituted plain error:

> Defendants of both groups [white and black] are entitled to trial before juries for which members of their race are not excluded as the result of purposeful discrimination by the prosecutor. We cannot hold that a white defendant convicted by a jury selected in a racially discriminatory manner should be satisfied with the knowledge that it is usually blacks who are unfairly treated and therefore may be denied relief himself.... Thus, we now hold ... that *Batson* applied to both white and blacks....

*Forte,* 865 F.2d at 64.

In *Brashear v. State,* 90 Md.App. 709, 603 A.2d 901, *cert. denied,* 327 Md. 523, 610 A.2d 796 (1992), this Court addressed the issue of whether white jurors may be excluded for discriminatory purposes. Relying upon the forceful logic of Judge Moylan in *Mejia v. State,* 90 Md.App. 31, 35, 599 A.2d 1207 (1992), this Court concluded that the *Batson* analysis must apply to "peremptories used against other groups." Writing for this Court, Judge Garrity adopted the reasoning of the Second and Third circuits but concluded that the trial court did not err in finding that the prosecutor's reasons for exercising peremptory challenges were race neutral. It is clear, therefore, that the *Batson* analysis applies with equal

force to the exercise of peremptory challenges in a manner discriminatory to blacks or whites.

Appellant also contends that the trial court erred in ruling that a prima facie case of discrimination had been established by the prosecution. As explained in *Mejia* and applied in *Brashear*, an appellate court's review of a trial judge's *Batson* ruling does not include a *de novo* fact finding or independent review. A trial court's ruling will be reversed only if it is clearly erroneous; we are not inclined to reverse the decision of the trial court unless clear error is presented. In reviewing the record in the case *sub judice*, we conclude that the trial court correctly assessed the defense's explanations as unsatisfactory. Under the law of this jurisdiction as expressed in *Brashear*, the prosecution established a *prima facie* case of discriminatory use of peremptory challenges, defense counsel failed to articulate race-neutral reasons for striking four of the prospective jurors, and the trial court concluded that the peremptory challenges were used in a discriminatory manner, thereby requiring the impaneling of a new jury. *See Hernandez v. New York*, —— U.S. ——, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). We find no clear error in the trial court's factual finding or in the application of law.

The facts of this particular case raise another rather novel issue. What relief is appropriate when a trial court finds that racial discrimination has motivated the use of peremptory strikes? In other cases considered by our courts, this issue was raised after a verdict had been rendered by the jury, so the only relief available was to remand the case for a new jury trial. In the instant case the discriminatory exercise of peremptory strikes was apparent before the jury was impaneled and sworn.

We believe Judge Heller correctly decided to impanel a new jury. In cases where the defense had made a *prima facie* case of discriminatory use of peremptory strikes and counsel for the State had failed to articulate satisfactory, nondiscriminatory, race-neutral reasons for exercising peremptory chal-

lenges, this Court and the Court of Appeals have consistently remanded the case for retrial. Because Judge Heller had already made a determination that a *prima facie* case of discriminatory use had been established and asked defense counsel to explain her use of peremptory challenges we need not remand the case for such an inquiry. *Compare Chew v. State,* 317 Md. 233, 562 A.2d 1270 (1989); *Gray v. State,* 317 Md. 250, 562 A.2d 1278 (1989); *Stanley v. State,* 313 Md. 50, 542 A.2d 1267 (1988). Once such a determination has been made and the State has been unable to offer satisfactory nondiscriminatory explanations for the use of peremptory challenges, a new trial is required. *Stanley,* 313 Md. at 92, 542 A.2d 1267. *McCollum* established the principle that the same rule applies to the defense as well as to the prosecution.

This particular case presents an unusual situation. Even if we were to conclude that the trial court erred in discharging the first venire, was appellant prejudiced by having his case tried by a jury selected from a different venire? If the court did err, the relief available would be a new trial before another jury selected from a different venire, which was essentially what appellant received when the court dismissed the first panel and began jury selection anew. Neither the State nor the defense has a vested right in a particular jury prior to its being impaneled; the law only provides that the jury be capable of impartiality. Finding no error either in Judge Heller's determination that defense counsel has misused peremptory strikes for an improper purpose or in her decision to discharge the venire and begin the jury selection process anew, we affirm. We also hold that appellant was not prejudiced by the ultimate selection of a jury from the second venire.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

Concurring opinion by WILNER, C.J.

WILNER, Chief Judge, concurring.

I heartily concur in the panel's decision and in the Opinion authored by Judge Bloom.

My purpose in writing separately is solely to suggest that, if *Batson* and its Federal and State progeny are to remain as governing principles in jury selection, we need to consider the continued viability of peremptory challenges. In making this comment, I do not mean to criticize either *Batson* or the cases that have followed or extended it. They rest on solid, fundamental principles of public policy. Nor do I deprecate in any way the intrinsic value of peremptory challenges, which have long been regarded as an important—indeed vital—mechanism for assuring a fair jury in both civil and criminal proceedings. The problem is that the two are finding it increasingly difficult to coexist and, as the quoted colloquy in this case indicates, precious judicial time and resources are being sidetracked into resolving the conflict between them.

We are at the point now, at least in Maryland, where it is impermissible to exercise a peremptory strike on the basis of race, gender, and, I expect, ethnic origin. Because the underpinning of this impermissibility is the Constitutional right to equal protection of the law (coupled in Maryland with the State Equal Rights Amendment), as Judge Moylan recognized in *Mejia v. State*, 90 Md.App. 31, 35, 599 A.2d 1207, *vacated and remanded*, 328 Md. 522, 616 A.2d 356 (1992), logic "compellingly requires that its strictures be used against any other cognizable group." Congress has already, by statute, declared certain forms of discrimination against older persons and persons with disabilities to be against national public policy. Are these categories too to be protected against discrimination in jury selection? Will it be impermissible to strike a prospective juror because he or she is over 55 or is disabled? Religious discrimination is also Constitutionally impermissible. Can a juror be struck because of his or her religion, or lack thereof?

Occasionally, the Supreme Court starts a march that, years later, it realizes has led it into a swamp, and it reverses

course. It may be too early yet to know whether that will happen here, but I suspect that it will not. We then may have to face the prospect that, in a seriously contested case, no peremptory challenge will go unchallenged, that counsel will be called upon to explain the basis of every one, that the court will then have to consider (1) whether the reason advanced by counsel falls within the dramatically reduced scope of allowable ones, and (2) even if, facially, it does, whether the reason asserted is merely pretextual. A whole new area of appellate review will blossom; indeed, the buds are already growing.

I recognize that the abolition of peremptory challenges would mark a dramatic change in the way our jury system has traditionally operated, and, if we were to do that, we would need to be more liberal in allowing challenges for cause and in permitting voir dire examination for the purpose of making those challenges. The question is whether that would be more, or less, efficient and whether it would produce a more fair, or less fair, result than the hoops we need to jump through now under *Batson* and its children. I don't know the answer to that, but I think it is a question we urgently need to address.