649 A.2d 1196

**Alfred BROGDEN**

v.

**STATE of Maryland.**

**No. 318, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Dec. 2, 1994.

Devy Patterson Russell, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty., on the brief), Baltimore, for appellee.

Submitted before ALPERT, FISCHER and MURPHY, JJ.

ALPERT, Judge.

Alfred Brogden, appellant, was convicted by a jury in the Circuit Court for Baltimore City (Hammerman, J. presiding) of possession of cocaine with intent to manufacture and distribute and simple possession of cocaine. The court merged simple possession into the greater offense and sentenced appellant to eight years imprisonment. In this appeal, appellant argues the following:

I. The trial court erred by striking the first jury that was selected,

II. The trial court erred by admitting hearsay testimony, and

III. The trial court erred by refusing to permit the defense to call a witness who had already been called by the State.

We find these arguments to be without merit and affirm the judgment of the trial court.

Appellant was standing near a Baltimore City street corner when a police car carrying three officers pulled up. The driver of the car, Officer Randy Pope, saw appellant drop two small containers from his left hand. All three officers exited the car, and Officer Pope went to investigate the items that appellant had dropped. The other two officers, Officer Ellison James and Detective Anthony Gingles, asked appellant to come speak with them; appellant complied. Officer Pope ascertained that the containers appellant dropped contained a total of 40 small bags of what was suspected to be cocaine. The officer then placed appellant under arrest. Subsequent analysis established that the substance in the bags was, in fact, cocaine.

## Discussion

### I

### The Jury

After a jury and two alternates were selected and pronounced acceptable by both the prosecutor and defense counsel, but before the jurors were sworn, the court announced: "The panel may be acceptable to the parties, but I do not believe necessarily that the panel is acceptable to the court. It seems to me that we have a very real Batson [1] situation here." The court pointed out that defense counsel had used eight of his ten peremptory challenges to strike white poten-

---

1. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

tial jurors. According to the court, only nine white potential jurors that were in the array had been called up during the jury selection process, and only one of those potential jurors had been seated.[2] The court told defense counsel: "I am finding a prima facie case [of racial discrimination] established and I think now you must respond and satisfy this court as to how those challenges were exercised."

In response to the trial court's finding, defense counsel first insisted that he "did not notice" that the eight potential jurors were white. He then conceded: "I noticed most of them happened to be white, but that was coincidental." Counsel stated that he used four criteria to exercise his peremptory challenges: (i) his client's "comfort" with the juror, (ii) age, (iii) occupation, and (iv) area of residence. He expressed his belief that potential jurors who were older than his forty-one-year old client might be unable to "relate to younger persons." Potential jurors who were nurses, teachers, or in supervisory roles might be "bias[ed] toward[ ] [his] client." Those who resided in "more affluent areas ... may be more sensitive to crime, and may be more biased." Defense counsel then stated on the record his reasons for striking the eight white potential jurors. He explained that Juror No. 130 "was stricken ... because of the age of 67, which in my mind, tends to show an inability to relate to my client." Juror No. 105 "was stricken as to my client's insistence." Counsel agreed that it was "possible" that his client objected to Juror no. 105 "because the juror was white." Juror No. 108 "was stricken because she was a teacher." Juror No. 113 "was stricken because of his occupation as a manager." Juror No. 120 was also stricken because of his occupation as a "manager." Juror No. 114 was stricken "because she was a nurse, and I feel that is an occupation that says bias." Juror No. 77 was stricken because she was a teacher, "and I thought the occupation would show great bias towards the facts of this case." He could not "give

---

2. The prosecutor subsequently noted that the array consisted of twenty-six African American and fourteen white potential jurors. He added that at least one of the fourteen white potential jurors had been struck for cause.

an answer" as to why No. 84 was stricken. Counsel added that he struck one African American potential juror because he was an investigator for the FBI. He did not explain why he struck the tenth potential juror. Although counsel had listed "area of residence" as one of the criteria he had used for striking potential jurors, he did not specify that any particular juror had been struck for that reason.

After listening to defense counsel's explanations, the court pointed out that defense counsel could have, but did not, use peremptory challenges against a sixty-seven-year old African American woman or an African–American man who was a supervisor. The court rejected counsel's explanations for the strikes and concluded:

> ... I am going to find that the defendant's challenges were exercised in an unlawfully discriminatory manner. I have already stated the fact that five of the first six white jurors were stricken right off the bat, and that eight out of the ten strikes were white people, and that with four challenges remaining to the defendant on alternate jurors, when all were black who were called up, no strikes were exercised. And therefore I am going to void the selection of this jury, and we will send for another jury tomorrow morning.

The following morning, before jury selection began anew, defense counsel objected to the striking of the first jury on the sole ground that "the challenges that I made to the jurors were based on reasons other than racial grounds...."

Appellant's current challenge to the trial court's action has three prongs. He contends that (i) the trial court abused its discretion by determining *sua sponte* that the manner in which the defense exercised its peremptory challenges created a *prima facie* case of racial discrimination, (ii) there is no prohibition against the use of peremptory challenges against white jurors, and (iii) even if a *prima facie* case of racial discrimination was properly established, defense counsel provided adequate, neutral reasons for the strikes. Preliminarily, we observe that the first and second prongs of appellant's

argument were not raised below and, therefore, are not properly before this Court. *See* Md.Rule 8–131(a). We shall nevertheless address them for guidance purposes.

(i)

■ Neither this Court nor the Court of Appeals has heretofore been asked to decide whether a trial court may determine *sua sponte* that the manner in which peremptory challenges were exercised created a *prima facie* case of racial discrimination. Cases decided in Maryland and elsewhere have, to this point, involved challenges by parties to the exercise of peremptory challenges by their opponents. *See, e.g., Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (challenge by defendant to strikes by prosecutor); *Georgia v. McCollum,* —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (challenge by State to strikes by defense); *Gilchrist v. State,* 97 Md.App. 55, 627 A.2d 44, *cert. granted,* 332 Md. 741, 633 A.2d 102 (1993) (challenge by State to strikes by defense).

In the seminal case of *Batson v. Kentucky,* a prosecutor used his peremptory challenges to strike the only four African–Americans in the array. Upon a challenge by the defendant, who was African American, the Supreme Court held that "the Equal Protection Clause [of the Fourteenth Amendment] forbids the prosecutor to challenge potential jurors solely on account of their race...." 476 U.S. at 89, 106 S.Ct. at 1719. The Court explained that "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Id.* at 86, 106 S.Ct. at 1717. The Court made clear, however, that the defendant is not the only person harmed by discriminatory jury selection practices. It observed that "by denying a person participation in jury service on account of his race, the State unconstitutionally discriminate[s] against the excluded juror." *Id.* at 87, 106 S.Ct. at 1718. The Court further observed that "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire

community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Id.* (Citations omitted).

The Court revisited the subject in *Georgia v. McCollum.* In that case, the Court extended the *Batson* holding to include situations where white defendants exercise peremptory challenges in a racially discriminatory manner against African American potential jurors. The Court reiterated:

> [T]his Court [has long] recognized that denying a person participation in jury service on account of his race unconstitutionally discriminates against the excluded juror. While '[a]n individual juror does not have a right to sit on any particular petit jury, ... he or she does possess the right not to be excluded from one on account of race.' Regardless of who invokes the discriminatory challenge, there can be no doubt that the harm is the same—in all cases, the juror is subjected to open and public racial discrimination.
>
> But 'the harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. One of the goals of our jury system is 'to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair.'

> *Be it at the hands of the State or the defense, if a court allows jurors to be excluded because of group bias, it is a willing participant in a scheme that could only undermine the very foundation of our system of justice—our citizens' confidence in it.* Just as public confidence in criminal justice is undermined by a conviction in a trial where racial discrimination has occurred in jury selection, so is public confidence undermined where a defendant, assisted by racially discriminatory peremptory strikes, obtains an acquittal.

— U.S. at —— – ——, 112 S.Ct. at 2353–54 (emphasis added) (citations omitted).

Contrary to appellant's suggestion, jury selection is *not* "between the State and the defense" alone. In light of the Supreme Court's comments in *Batson* and *McCollum,* it is clear that jury selection affects potential jurors and the entire community. It reflects upon the integrity of the judicial system as a whole. A trial judge need not sit idly by when he or she observes what he perceives to be racial discrimination in the exercise of peremptory challenges. He is clearly entitled to intervene. *Cf. Grossfeld v. Braverman,* 203 Md. 498, 500–01, 101 A.2d 824 (1954) (where, in response to the court's questioning, a juror indicated that he had preconceived ideas that would prevent him from fairly and impartially deciding the case, the court properly excluded the juror on its own motion).

### (ii)

In appellant's view, *Batson* and its progeny do not prohibit the exercise of peremptory challenges against white potential jurors for the sole reason that they are white. Appellant argues that

> *Batson* cannot be so extended because its holding rests on an equal protection foundation, which requires that the challenged juror be a member of a 'cognizable racial group,' defined as 'one that is a recognizable, distinct class, singled out for different treatment under the laws as written or applied.'

(citation omitted).

In fact, *Batson* requires only that the challenged juror be a member of a racial group that is *"capable* of being singled out for differential treatment." 476 U.S. at 94, 106 S.Ct. at 1722 (emphasis added). Appellant does not contend that white persons are not capable of being singled out for different treatment under the laws. He boldly asserts that "[w]hites, as a class[,] *have not* been singled out for unequal treatment." (emphasis added.)

In any event, our decision in *Gilchrist,* 97 Md.App. 55, 627 A.2d 44, is dispositive of this issue. Gilchrist, an African

American, used peremptory challenges to strike white potential jurors. Upon the prosecutor's complaint, the court excused the entire array and directed that a second jury be selected from a new array. Gilchrist appealed, contending "that the *Batson/McCollum* analysis is not applicable to the discriminatory removal of whites from a venire panel." *Id.* at 75, 627 A.2d 44. After reviewing the relevant case law from Maryland and other jurisdictions, we concluded that "[i]t is clear ... that the *Batson* analysis applies with equal force to the exercise of peremptory challenges in a manner discriminatory to blacks or whites." *Id.* at 75–76, 627 A.2d 44.

(iii)

As we explained in *Gilchrist*, 97 Md.App. at 76, 627 A.2d 44, once "the prosecution establishe[s] a *prima facie* case of discriminatory use of peremptory challenges," the defense may overcome the challenge only by "articulat[ing] race-neutral reasons for striking ... the prospective jurors...." Appellant posits that even if a *prima facie* case of racial discrimination was properly established, defense counsel provided adequate, neutral reasons for the strikes. Appellant complains that the court erroneously rejected defense counsel's explanations "based on whether [it] thought them to be good reasons, not whether they were racially discriminating reasons."

As the trial court pointed out, defense counsel struck one white potential juror because he was sixty-seven years old, but failed to strike a sixty-seven-year old African American juror. Counsel struck five white potential jurors because they were teachers, managers, or nurses—occupations which, in counsel's view, might trigger "bias towards [his] client"—but did not strike an African–American man who worked as a supervisor. Counsel struck one potential juror "as to [his] client's insistence" but admitted that appellant may have opposed the juror because the juror was white. Counsel could not explain why he struck another white potential juror. Thus, the trial court expressly concluded that defense counsel's explanations

for striking of all eight white potential jurors were either pretextual or inadequate. In *Gilchrist,* we explained that

> an appellate court's review of a trial judge's *Batson* ruling does not include a *de novo* fact finding or independent review. A trial court's ruling will be reversed only if it is clearly erroneous; we are not inclined to reverse the decision of the trial court unless clear error is presented.

97 Md.App. at 76, 627 A.2d 44. On the record before us, as in *Gilchrist,* "we conclude that the trial court correctly assessed the defense's explanations as unsatisfactory." *Id.*

## II

### Hearsay

Appellant next contends that the trial court erred by admitting hearsay through Officers Pope, James, and Gingles. Appellant points out that the officers testified that, upon receiving information from an unspecified source, they went to the street corner where appellant was apprehended. According to appellant, the testimony improperly revealed out-of-court statements made by a confidential informant.

### (i)

Appellant's argument as to Officer Pope's testimony is completely unfounded. Although appellant contends that the trial court erred by admitting hearsay through Officer Pope, the record makes clear that the testimony in question was *not* admitted. The following transpired during direct examination of the officer:

*BY MR. PHILLIPS* [prosecutor]:

. . . . .

Q Somewhere in the evening hours near 8:30 to 9:00 o'clock, did you have occasion to receive information which caused you to respond to the 2400 block of Francis Street in Baltimore City?

A Yes, I did.

Q And can you tell us, sir, when you got to Francis Street, what were you looking for?

A I was looking for two black males.

MR. SILVERMAN: Objection. Wish to approach.

After the resulting bench conference, the court sustained defense counsel's objection and struck the testimony from the record. At defense counsel's request, the court instructed the jury:

Now, ladies and gentlemen of the jury, I realize that this may be somewhat of a fiction to say to you disregard what you've heard. You've heard what you've heard. You can't eliminate it from your minds. But what I mean by disregarding it is that you are not to give any consideration whatsoever in your deliberations to that which I have ordered stricken from the record.

In addition to objecting to Officer Pope's testimony, appellant did move for a mistrial. That motion was denied, but appellant does not now contend that the trial court erred in denying the motion.

(ii)

Appellant points out that the direct examination of Officer James proceeded as follows:

Q And as you came onto Francis Street, was you[r] attention drawn to anyone in particular?

A Yes, it was.

Q And can you tell us, can you describe that person, please?

A Yes. My attention, first of all, was drawn to a black male [not appellant] who had on all green clothing.

Q And can you tell us how your attention was drawn there?

A We had received information that this person was [on] the corner of Francis and Whitelock Street dealing narcotics.

MR. SILVERMAN: *Objection.*

THE COURT: *I will sustain the objection.*

Q What I mean, Officer, is: When you first saw [appellant on the street corner], did anyone tell you to pay particular attention to him?

A Yes, they did.

Q And who was that?

A Officer Randy Pope.

Q Now, as you were paying attention to this, what was happening?

A As I was paying attention to the black male in all green, Officer Pope, who was driving the vehicle, made a right-hand turn onto Francis Street, at which time Officer Pope said, "There he is."

Q And were you able to determine when Officer Pope said, "There he is," to whom he was referring?

A Yes, I was.

Q And who was that?

A Mr. Brogden, at the time was wearing a green shirt—

MR. SILVERMAN: *Objection.*

THE COURT: *Overruled.*

(emphasis added.)

█ The trial court sustained defense counsel's first objection to Officer James's testimony, thus granting counsel all the relief for which he asked. Counsel's second objection did not involve a reference to an out-of-court statement by a confidential informant but a reference to a remark made by Officer Pope. That remark—"There he is"—was not hearsay. *See Ali v. State,* 314 Md. 295, 304, 550 A.2d 925 (1988) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" (footnote omitted)). The remark was not offered to show the truth of the matter asserted—that appellant was on the street corner—but only to explain why and when Officer James directed his attention to appellant.

■ To the extent that appellant may be suggesting that Officer Pope's remark, which was repeated by Officer James, referred to an out-of-court statement by a confidential informant, the argument is without merit. As we have observed, the court had just sustained defense counsel's objection to Officer James's testimony that the officers had "received information" that a person on the street corner was "dealing narcotics." Moreover, that earlier testimony referred to information received about a person dressed in "all green clothing," and the record makes clear that appellant was not that person.

### (iii)

Detective Gingles was called as a witness for the defense. During defense counsel's direct examination of the officer, the following transpired:

Q ... [C]ould you tell me the sequence of events which led up to the arrest of Mr. Brogden?

A Yes, sir. The sequence of events were: We received information—

THE COURT: Talk up into the microphone, please, Detective Gingles.

A Yes, sir. We had received information—

MR. SILVERMAN: Objection.

THE COURT: The objection is overruled.

Q Could you please—

THE COURT: Now, let the witness answer the question, sir. You may answer the question as you were doing, sir.

A Yes, sir. We received information via KGA police radio from our supervisor.

Q Objection.

THE COURT: Overruled. You may continue, Detective Gingles.

A In reference to a CDS violation that had occurred or was occurring at the 2400 block of Francis Street at Whitelock.

 Defense counsel should have anticipated that, when asked to describe the "sequence of events which led up to [appellant's] arrest," Detective Gingles would recount that the officers "received information" from their supervisor over the police radio. Generally, in the absence of an unresponsive answer, counsel may not object to testimony given in response to his own questioning. *See generally* Md.Rule 4–323(a). Had counsel wanted to prevent the detective from revealing information about the dispatch call, he could have withdrawn his broad question and promulgated a more narrowly drawn question. He did not do so. Under the circumstances, the trial court properly permitted Detective Gingles to answer the question that was asked.

## III

### Defense Witness

 Defense counsel called Officer Pope, who had already testified for the State, as the first witness for the defense. After defense counsel asked a few preliminary questions, the court called a bench conference and expressed its opinion that defense counsel was attempting to cross-examine Officer Pope "all over again." Defense counsel explained that he intended to impeach Officer Pope's credibility by contradicting a statement that he made the day before on direct examination by the State. According to counsel, although the officer testified that he "had turned the corner of Whitelock Street onto Francis Street when he observed Mr. Brogden," the police report prepared by the officer indicated that he "observed Mr. Brogden, the defendant, not when he was around the corner but when he was pulling up to the corner." Counsel stated: "I believe that this contradiction is of vital evidence to the defense, and I would object to it being excluded and I will move for a mistrial." The court concluded: "[I]f it's so vital, it should have been asked yesterday when he testified on cross examination. That was your opportunity." The court excused the witness and denied defense counsel's motion for mistrial.

By defense counsel's own admission, his sole purpose for calling Officer Pope as a defense witness was to impeach his credibility by showing that his earlier testimony as to where he was when he first saw appellant was at odds with what he wrote in his report. As the trial court opined, impeachment is more properly a subject for cross-examination. *See generally* Md.Rule 1–501; 6 McLain *Maryland Evidence* § 611.1 (1987). We are thus satisfied that the trial court correctly concluded that counsel was attempting to reopen cross-examination. Defense counsel did cross-examine Officer Pope extensively as to where he was when he first spotted appellant. Counsel then had ample opportunity to impeach Officer Pope about the alleged discrepancy. His failure to do so is unexplained. "[O]nce a party has fairly and substantially exercised the right to cross-examine, the court, in its discretion and in the interest of judicial economy, may preclude further cross." 6 McLain, § 611.1 at 128. *See McCray v. State,* 305 Md. 126, 133–34, 501 A.2d 856 (1985) ("trial judges have broad discretion in the conduct of trials in such areas as the reception of evidence and order of proof" (citations omitted)). We perceive no abuse in the trial court's exercise of discretion.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.