672 A.2d 143

Marjorie HALL

v.

James MARTIN, Personal Representative of the Estate of Catherine Martin.

No. 627, Sept. Term, 1995.

Court of Special Appeals of Maryland.

Feb. 29, 1996.

436

Leonard A. Orman, P.A., Baltimore, for Appellant.

Allan A. Noble (Budow and Noble, P.C., on the brief), Bethesda, for Appellee.

Argued before BLOOM, FISCHER and CATHELL, JJ.

CATHELL, Judge.

Marjorie Ball appeals from a judgment entered after a verdict by a jury in the Circuit Court for Howard County in a case arising out of a motor vehicle accident.[1] At the time of the accident, appellant was a passenger in a car driven by her sister, Catherine Martin, now deceased. Appellant brought this suit, to recover for injuries sustained in the accident, against the Estate of Catherine Martin, *i.e.*, James Martin, Personal Representative of the Estate of Catherine Martin, appellee. Appellant presents four questions:

1. Did the trial court err in ... failing to provide Appellant with a proper hearing regarding her *Batson*[2] challenge which challenged Appellee's racially discriminatory peremptory strike of the only African[ ] American juror

---

**1.** Appellant received a nominal judgment in her favor. Aggrieved thereby, she appeals, raising serious constitutional issues.

**2.** *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

on the panel of prospective jurors, in overruling her *Batson* challenge and in failing to empanel a new jury?

2. Did the trial court err in failing to provide Appellant a proper hearing regarding her *Batson* challenge which challenged Appellee's gender discriminatory peremptory strike[s] of three women on the panel of prospective jurors, in overruling her *Batson* challenge and in failing to empanel a new jury?

3. Did the trial court err in refusing to preclude the mentioning of or evidence of the fact that Appellant was suing the estate of her late sister?

4. Did the trial court abuse its discretion by restricting Appellant's cross[-]examination of Appellee's expert witness in regards to credibility, bias and prejudice?

## 1 and 2

We shall address questions 1 and 2 together.

## The Racial Issue

During the seating of the jury, after the parties had exercised their peremptory strikes, appellant's counsel approached the bench and the following exchange occurred:

MR. ORMAN [APPELLANT'S ATTORNEY]: I'm going to object to defense counsel striking Juror Number Thirteen. *That was the only black juror—prospective juror,* and who I assert was stricken solely because of her race. And I wanted to put this on the record.

THE COURT: Okay. Counsel, any response?

MR. NOBLE [APPELLEE'S ATTORNEY]: She was not stricken because of her race, Your Honor. There were other reasons, good and valid, having to do with her spouse's employment, her employment and other matters.

THE COURT: Home improvement is her spouse's employment. What's that got to do with the case?

MR. NOBLE: I didn't want a builder.

THE COURT: Why?

MR. NOBLE: Those are my reasons, Your Honor.

THE COURT: That you didn't want a builder[.] ...
This is an auto tort case.

. . . .

MR. NOBLE: And her age ...

. . . .

THE COURT: He indicates he hadn't struck her for race.

. . . .

MR. ORMAN:—Excuse me—he has to state it on the record, satisfactory to the Court ... and not just saying because he's a home builder and because she's a secretary. He has to state on the record exactly why he struck her and why it is not involved in race....

THE COURT: And your basis is her spouse is a home improvement—

MR. NOBLE: That's it; that's it.... It's a combination of things, Your Honor. Secretary, spouse in home improvement, age, and—and her appearance ... It's not race-related; there's an issue of ... Well, that's my reasons.

THE COURT: Okay; it's noted. I'll deny it....

. . . .

MR. ORMAN: I'm going to put one more thing on the record....

MR. ORMAN: ... [A]ll of his strikes were of women. [Emphasis added.]

As we shall discuss *infra*, the trial court never made any ruling on the issue of gender-based discrimination.

Appellee argues in his brief, *inter alia:*

[T]here was no proof of the make up of the panel or that prospective juror number thirteen was the only African American juror on the panel.

. . . .

... Appellant asserts that the necessary inference is raised because Appellee removed the only African American from the prospective jury panel. However, no proffer was made that juror thirteen was the only African American.

Appellee is mistaken. Appellant, as can be seen from the above colloquy, did assert that juror number thirteen was the only prospective juror who was African American. Under *Mejia v. State*, 328 Md. 522, 539, 616 A.2d 356 (1992), that is sufficient to establish a *prima facie* showing of that fact absent disagreement by appellee at trial. *Mejia* is one of the Court of Appeals's more recent comprehensive opinions addressing *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Mejia v. State*, 90 Md.App. 31, 46, 599 A.2d 1207, *vacated*, 328 Md. 522, 616 A.2d 356 (1992), we noted:

> Once again, appellant's counsel boldly and broadly proclaims that except for Peter Estrada, the rest of the jury panel was non-Hispanic.... Except for counsel's self-serving *ipse dixit* in this regard, however, there was no basis for such a conclusion with respect to the rest of the panel.

The Court of Appeals resolved this issue differently, first quoting from the trial transcript portions of the colloquy that referenced the *Batson* problem:

> [The Petitioner's Counsel]: ... We have an Hispanic defendant charged with raping a non-Hispanic or white woman. There is only one Hispanic person on the jury panel. The State has used its strike to strike that person.
>
> . . . .
>
> ... [A] racially motivated strike that is taking out the only Hispanic juror in a panel of 50 people.

328 Md. at 528, 616 A.2d 356 (footnote omitted). The Court of Appeals then stated:

> When challenging the State's use of its peremptories to strike Mr. Estrada, the petitioner stated explicitly what previously may have been only implicit, that he was Hispanic and that the State was striking the only person on the venire identified by anyone as Hispanic.
>
> The record is clear; at no time ... did the prosecutor voice the view that there really was no "Hispanic problem," that the petitioner was not Hispanic, that Mr. Estrada did not have an Hispanic background, or that other panel members did, or may have.... Not only was the ruling

made before the State offered an explanation for striking Mr. Estrada, but it was made without affording the State the opportunity to do so.

*Id.* at 528–29, 616 A.2d 356. The Court held:

When ... a party states, as a fact, his or her conclusion concerning the composition of the venire or that a particular venire person is a member of a group ... and, the other side ... does not challenge that assertion, the fact will be deemed established.

*Id.* at 535, 616 A.2d 356. Thus, by applying *Mejia* to the case *sub judice*, we find no basis to conclude other than that juror number thirteen was the only African American on the venire.

Appellee has also proffered: "Appellant failed to request a hearing on the matter of racial discrimination." The procedure used below was sufficient, and the trial court in fact did hear and resolve the issue. Appellant argues that it did so improperly.

As will be seen from the cases we shall hereafter discuss, appellant met her burden of presenting a *prima facie* case of discrimination under *Batson* by appellee's use of his peremptory challenges. We must determine whether appellee thereafter satisfied his burden of showing that his exercise of strikes was nondiscriminatory, *i.e.,* neutral. We then must determine whether the trial court's finding that appellant did not meet the ultimate burden of proving that appellee's strikes were improperly discriminatory was correct. But first we discuss *Batson* and its progeny—a series of cases leading from the strikes of prosecutors in criminal cases to the use of strikes for discriminatory purposes by any party in any case, emphasizing, as we believe the earlier cases have done, the right of prospective jurors not to be discriminated against in the jury selection process and emphasizing, as we believe the later cases have done, the deference an appellate court must afford the trial court's findings in regard to the discriminatory or nondiscriminatory character of the strikes in question.

*Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), a decision in which the Supreme Court filed four

concurring and two dissenting opinions in addition to the 7/2 majority opinion, involved a prosecutor's striking of African American jurors in a criminal case in which the defendant was also African American. As is often overlooked, *Batson* expressly "reaffirmed" *Strauder v. West Virginia,* 10 Otto 303, 100 U.S. 303, 25 L.Ed. 664 (1880). Thus, we briefly consider *Strauder,* especially in regard to the rights of venire persons to serve on petite juries.

When Strauder, an African American man, was tried for murder in West Virginia, the laws of that state provided that no "colored man" was eligible to serve on a jury. The *Strauder* Court identified the controlling question before it as:

Whether by the Constitution and laws of the United States, every citizen ... has a right to a trial of an indictment ... by a jury selected and impaneled without discrimination against his race ... because of race....

*Id.* at 305, 100 U.S. at 305, 25 L.Ed. 664. Turning to the Fourteenth Amendment, the Court noted:

The true spirit and meaning of the Amendments, as we said in the *Slaughter–House Cases,* 16 Wall., 36, 21 L.ed. 394, cannot be understood without keeping in view the history of the times when they were adopted, and the general objects they plainly sought to accomplish.... [I]t required little knowledge of human nature to anticipate that those ... when suddenly raised to the rank of citizenship, be looked upon with jealousy and positive dislike, and that state laws might be enacted ... to perpetuate the distinctions that had before existed.... [The Fourteenth Amendment] was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by [the] white [race]....

If this is the spirit and meaning of the Amendment, whether it means more or not, *it is to be construed liberally, to carry out the purposes of its framers....*

... [S]uch a discrimination [the West Virginia statute] ought not to be doubted. Nor would it be if the persons excluded by it were white men.... The very fact that

colored people are singled out and expressly denied by a statute all right to participate in the administration of the law, *as jurors,* because of their color ... is practically a brand upon them, affixed by the law ... and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others.

... Is not protection of life and liberty against race or color prejudice, a right, a legal right, under the constitutional Amendment? [Emphasis added.]

*Id.* at 306–07, 100 U.S. at 306–07, 25 L.Ed. 664.

In *Batson,* the Supreme Court, explaining *Strauder,* reaffirmed the importance, not only to the rights of criminal defendants as to jury composition, *but also as to the rights of classes of citizens to serve as jurors:* "Exclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure." *Batson,* 476 U.S. at 85, 106 S.Ct. at 1716.

Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try. Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial. A person's race simply "is unrelated to his fitness as a juror." As long ago as *Strauder,* therefore, the Court recognized *that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror.*

The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice.

*Id.* at 87, 106 S.Ct. at 1718 (emphasis added, citation omitted).

The *Batson* Court then rejected the prior *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965),

position that "proof of repeated striking of blacks over a number of cases was necessary to establish a violation," 476 U.S. at 92, 106 S.Ct. at 1720, because *Swain* had made it virtually impossible for a defendant to challenge a prosecutor's use of peremptory challenges. The Court then noted that a *prima facie* case of purposeful discrimination would be established if a defendant demonstrated "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 94, 106 S.Ct. at 1721. Thereafter, "the burden shifts to the State to explain adequately the racial exclusion." *Id.* The majority opinion then set out the proper procedure to be used when the exercise of peremptory strikes is being challenged: Once a *prima facie* case has been established, the

> burden shifts to the State *to come forward* with a neutral explanation ... the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. But the prosecutor may not rebut ... by stating merely that he challenged ... on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race.... The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried.

*Id.* at 97–98, 106 S.Ct. at 1723–24 (footnote omitted).[3]

*Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), extended *Batson* to civil trials. Leesville, during *voir dire,* used two of its three peremptory strikes to remove African Americans from the prospective jury. Edmonson moved that Leesville articulate a race-neutral reason for its strikes. His request was denied on the ground that *Batson* did not apply to civil proceedings. A panel of the Fifth Circuit Court of Appeals initially reversed, making *Batson* applicable to civil proceedings. The entire

---

3. Interestingly, the dissents of Chief Justice Burger and Justice Rehnquist foretold the ultimate course that *Batson* began, by noting that, while *Batson* was limited to the exercise of peremptories by prosecutors, it would lead to limits on "both prosecutors and defense attorneys alike." 476 U.S. at 126, 106 S.Ct. at 1738.

Fifth Circuit, *en banc*, then reversed the panel and affirmed the trial court. The Supreme Court ultimately reversed, extending *Batson* to civil trials. In so doing, the Supreme Court discussed several cases to emphasize that it had "made clear that a prosecutor's race-based peremptory challenge violates the equal protection rights *of those excluded from jury service.*" *Id.* at 618, 111 S.Ct. at 2081 (emphasis added). "A defendant may raise the excluded jurors' equal protection rights." *Id.* The Court opined further that "discrimination on the basis of race ... in a civil proceeding *harms the excluded juror* no less than discrimination in a criminal trial." *Id.* at 619, 111 S.Ct. at 2082 (emphasis added).

In *J.E.B. v. Alabama ex rel. T.B.,* —— U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), a putative father in a paternity case questioned the State's use of peremptory challenges to exclude men from the jury. Justice Blackmun concisely summarized the conclusions from *Batson* and its offspring:

Since *Batson,* we have reaffirmed repeatedly our commitment to jury selection procedures that are fair and nondiscriminatory. We have recognized that whether the trial is criminal or civil, *potential jurors, as well as litigants,* have an equal protection right to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice.

Although premised on equal protection principles that apply equally to gender discrimination, all our recent cases ... involved alleged racial discrimination.... Today we are faced with ... whether the Equal Protection Clause forbids intentional discrimination on the basis of gender.... We hold that gender, like race, is an unconstitutional proxy for juror competence and impartiality.

*Id.* at ——, 114 S.Ct. at 1421 (citations omitted). Interestingly, in *J.E.B.,* while the State had exercised nine of its ten challenges to strike male jurors, defendant (much as appellee argues that appellant did in the case *sub judice*) used all but one of his strikes to remove female jurors. Again, in *J.E.B.,*

the Court stressed its concern over the rights of jurors to serve:

In recent cases we have emphasized that individual jurors themselves have a right to nondiscriminatory jury selection procedures.... All persons ... have the right not to be excluded summarily because of discriminatory and stereotypical presumptions that reflect and reinforce patterns of historical discrimination.... It *denigrates the dignity of the excluded juror,* and, for a woman, reinvokes a history of exclusion from political participation.

*Id.* at ——, 114 S.Ct. at 1428 (footnotes omitted and emphasis added).[4]

In Maryland, recent cases addressing *Batson* include *Brogden v. State,* 102 Md.App. 423, 649 A.2d 1196 (1994), in which the trial court *sua sponte* raised the issue that the defense had used eight of its ten peremptory strikes to exclude white jurors. The circuit court then announced that it had found a *prima facie* case of racial discrimination and directed the defense to respond. The defense counsel stated that the pattern of defensive strikes was coincidental, and stated that they were based on the defendant's "comfort" with a juror, as well as a juror's age, occupation, and area of residence. *Id.* at 427, 649 A.2d 1196. The trial court rejected the defendant's explanation and voided the jury selection. Ultimately, the defendant was tried over his objection by a separately impanelled jury. We affirmed the trial court's striking of the first jury because it had found that the defendant used strikes for racial reasons, noting: "[I]t is clear that jury selection affects *potential jurors and the entire community.* It reflects upon the integrity of the judicial system as a whole." *Id.* at 431, 649 A.2d 1196 (emphasis added). In affirming, we paid deference to the trial court's finding.

---

**4.** Justice O'Connor, in a concurring opinion, stressed her view that gender-based issues as they relate to peremptory challenges should be limited to the State's use thereof. *J.E.B. v. Alabama ex rel. T.B.,* —— U.S. ——, ——, 114 S.Ct. 1419, 1430–33, 128 L.Ed.2d 89 (1994).

The Court of Appeals, in *Gilchrist v. State*, 340 Md. 606, 667 A.2d 876 (1995) adopted the three-step process, first set out by the Supreme Court in *Batson*, for use by our trial courts when

assessing claims that peremptory challenges were being exercised in an impermissibly discriminatory manner.

First, the complaining party has the burden of making a *prima facie* showing that the other party has exercised its peremptory challenges on an impermissibly discriminatory basis, such as race or gender. . . .

Second, once the trial court has determined that the party complaining about the use of the peremptory challenges has established a *prima facie* case, the burden shifts to the party exercising the peremptory challenges to rebut the *prima facie* case by offering race-neutral explanations for challenging the excluded jurors. . . .

Finally, the trial court must "determine whether the opponent of the strike has carried his burden of proving purposeful discrimination."

*Gilchrist*, at 625–26, 667 A.2d at 885 (citations omitted); *see also Stanley v. State*, 313 Md. 50, 56, 542 A.2d 1267 (1988).

■ We recognize that, in *Adams v. State*, 86 Md.App. 377, 383–84, 586 A.2d 810, *cert. denied*, 323 Md. 33, 591 A.2d 249 (1991), we noted a possible additional step in the process of arriving at a finding that a *prima facie* case has been established under the factual circumstances therein extant. We noted that the party asserting a *Batson* violation also had to "show that those facts [*i.e.*, the striking of a person of the defendant's race] and any other relevant circumstances raise [a rebuttable presumption] that the prosecutor . . . exclud[ed] veniremen . . . on account of their race." *Id.* at 382, 586 A.2d 810 (quoting *State v. Gorman*, 315 Md. 402, 410, 554 A.2d 1203 (1989)) (some brackets in original). We distinguished *Adams* from *Stanley, supra*, and its companion case, *Trice v. State*, 310 Md. 695, 531 A.2d 682 (1987) because, in *Adams*, only one of several members of a protected class were stricken and the juror at issue was in fact replaced by another juror of the same protected class, whereas, in *Stanley* and *Trice*, the only

member, and thus all members, of a protected class were stricken. 86 Md.App. at 384, 586 A.2d 810. The instant case comes within the holdings of *Stanley* and *Trice*. Thus, when all of the members of a protected class are stricken and the objecting party asserts that it was done for improper discriminatory reasons, no further showing of discriminatory purpose need be made in order to establish a *prima facie* showing. That showing was made in the case *sub judice*.

■ Having determined that appellant has met her burden of putting forth a *prima facie* case, we now address whether appellee effectively rebutted it. In doing so, we again note what appellee said and, more important, what he did not say: "She [juror number thirteen] was not stricken because of her race.... I didn't want a builder." When asked by the trial court why he did not want a builder, he simply responded, "Those are my reasons, Your Honor." Later, appellee added as a reason for striking the juror, "and her age." Then, even later, after the trial court prompted him by exclaiming, "And your basis is her spouse is a home improvement—," appellee exclaimed, "That's it; that's it," "It's a combination of things, Your Honor. Secretary, spouse in home improvement, age," and then added, "and—her appearance." That is the sum and substance of the reasons given. The reasons proffered by appellee to justify striking the only African American prospective juror do not rise to the level of the reasons put forth in *Gilchrist*. *See* 340 Md. at 628, 667 A.2d at 886–87. In *Gilchrist*, however, the Court of Appeals affirmed the trial court's findings. We are here asked to reverse them. As we shall explain, the deference that is now due a trial court's findings controls the nature of appellate review when the reasons given are facially neutral.

In *Gilchrist, supra*, the defendant was an African American male charged with the distribution of cocaine and various related counts. While seating the jury, the defense used seven peremptory challenges to strike white jurors. The circuit court found that the State had made a *prima facie* case of discrimination and then permitted defense counsel to rebut.

Two of the jurors challenged by the defendant were crime victims, and a third juror was challenged because the defendant was uncomfortable with the way the juror stared at him. In respect to these three jurors, the court found the defendant's reasoning to be acceptable. As for the four other strikes, "[w]ith respect to one of the challenged jurors, defense counsel could offer no reasons. As to [the] three other jurors, the reasons given by defense counsel were that one looked like a former school teacher whom defense counsel did not like, one did not 'relate to' anyone or anything in the courtroom, and one was dressed in a navy blazer and khaki slacks." *Gilchrist*, at 628, 667 A.2d at 887. The Court of Appeals affirmed both the trial court's finding that these reasons were mere pretext and the court's decision not to seat the first jury, but to dismiss that jury pool and start anew.

Had the trial court in the case *sub judice* found that the reasons given for the striking of the juror were insufficient, we, in examining the reasons appellee asserted below, would look for what, if anything, extended beyond mere pretext. As we shall attempt to explain, however, the apparently broad scope of *Batson* has been severely constricted by recent cases.

The two key cases are *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), and *Purkett v. Elem*, —— U.S. ——, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). *Purkett* is discussed in the concurrence of Judges Chasanow and Bell in *Gilchrist*, wherein it is suggested that the majority failed to afford *Purkett* the full range of its holding relating to the second step of the *Batson* inquiry. As we perceive it, that reluctance (if it existed) may have been occasioned by reason of the *Gilchrist* majority's review of the grant of a *Batson* challenge, not a denial. *Purkett*, as Judge Chasanow proffered, appears to us to change drastically the impact of *Batson* by appearing to limit seriously the power of appellate courts to address the findings of trial courts in respect to the second step when that court is confronted with, and accepts, facially neutral reasons for the strikes, at least as far as the federal

constitution is concerned.[5]

*Batson* and its earlier progeny have been described by doomsayers as the death of the peremptory challenge. Jeffrey Rosinek, *Juror Discrimination: Death of the Peremptory Challenge*, Ct.Rev., Spring 1995, at 6–9; *see also* Raymond J. Broderick, *Why the Peremptory Challenge Should be Abolished*, 65 Temp.L.Rev. 369 (1992); Steven M. Puiszis, *Edmonson v. Leesville Concrete Co.: Will the Peremptory Challenge Survive its Battle with the Equal Protection Clause?*, 25 J. Marshall L.Rev. 37 (1991). However, as pointed out in John R. Woodward, III & Barbara E. Rush, *Bullet–Proofing Your Peremptory Challenges*, For the Def., Mar. 1995, at 17, 19, the Supreme Court and various courts of the federal circuits, have, since *Batson*, been gradually accepting facially neutral explanations in the second step of the *Batson* inquiry. *See Hernandez, supra* (uncertainty with whether a Hispanic juror would accept the translation of an interpreter); *United States v. Diaz*, 26 F.3d 1533, 1542 (11th Cir.1994), *cert. denied, —— U.S. ——*, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995) (general inattentiveness and focusing on defense table); *United States v. Rudas*, 905 F.2d 38, 41 (2d Cir.1990) (sleeping during jury selection); *United States v. Ruiz*, 894 F.2d 501, 506 (2d Cir.1990) (strangely staring, a perception that a juror lacked the strength of his conviction, and participation in previous cases resulting in hung juries); *United States v. Biaggi*, 853 F.2d 89, 96 (2d Cir.1988), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989) (the holding of jobs that might cause them to identify with a defendant and negative demean-

---

**5.** *Batson*-type principles were enunciated prior to *Batson* by certain state courts. *See People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978); *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499, *cert. denied*, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); *People v. Thompson*, 79 A.D.2d 87, 435 N.Y.S.2d 739 (1981); *State v. Slappy*, 522 So.2d 18 (Fla.), *cert. denied*, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988). In Richard C. Reuben, *Excuses, Excuses*, A.B.A.J., Feb. 1996, at 20, the writer notes that, post *Purkett*, there are assertions that "peremptory challenge claims may have greater chances of success under state law. 'California law on this issue precedes *Batson* and is tied to the state constitution'...."

or); *United States v. Angiulo,* 847 F.2d 956, 985 n. 37 (1st Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 138, 102 L.Ed.2d 110 (1988) (false statements in a questionnaire, flip answers, distraction caused by child care, and living in the same town as a defendant).

What had theretofore been a case-by-case consideration of specific reasons become more generalized by the language of *Purkett, supra. See* Richard C. Reuben, *Excuses, Excuses: Any old facially neutral reason may be enough to defeat an attack on a peremptory challenge,.* A.B.A. J., Feb. 1996, at 20. "The peremptory challenge, once pronounced comatose because of a line of cases restricting its use, has been resurrected by a little-noticed U.S. Supreme Court decision. *Purkett* ... a facially neutral reason—even if it is 'implausible or fantastic'—can be a sufficient basis for a peremptory." *Id.* The reason that *Purkett* was so little noticed is that, in most instances, appellate courts were upholding the trial courts' findings that the reasons proffered in particular cases were, in fact, pretexual, and were thereby upholding the trial courts' *findings* of *Batson* violations. This essentially appears to be the reason that *Gilchrist, supra,* merely mentioned *Purkett* as an aside and did not take the extra step of invoking *Purkett,* as Judge Chasanow's concurrence suggested should be done. In the case *sub judice,* however, the trial court accepted the facially neutral reasons proffered by appellee. Thus, the *Purkett* holding, with its explanation of *Batson,* is directly implicated and is necessary for us to consider in our review of the questions raised. In so doing, we shall borrow liberally from the reasoning in Judge Chasanow's *Gilchrist* concurrence; the circumstances of the case at bar demand a full consideration of *Purkett,* while *Gilchrist* may only have invited that consideration, an invitation the majority there declined to accept.

Moreover, subsequent to *Gilchrist,* the Court of Appeals, in a *per curiam* opinion, decided *Harley v. State,* 341 Md. 395, 671 A.2d 15 (1996) [No. 160, 1995 Term, filed February 6, 1996], in which it reiterated the deference to be accorded a trial court's rulings in a case where a *Batson* challenge was

denied by the trial court (as it was in the case *sub judice* ). While *Gilchrist* was the other side of the coin, *i.e.,* a trial court finding of purposeful discrimination, it, nevertheless, when combined with *Harley,* requires the more comprehensive position we take in the case *sub judice.* Much of *Gilchrist's* discussion of appellate deference to the trial court's findings, as extended in *Harley,* is directly controlling in the case at bar. Furthermore, *Purkett* was decided May 15, 1995, after the oral argument in *Gilchrist,* but before the oral argument in the case *sub judice.* Thus, *Purkett* has been controlling throughout our review of the issues we now address.

The United States Supreme Court, after noting that the trial court in *Purkett* had "without explanation, overruled respondent's objection and empaneled the jury," —— U.S. at ——, 115 S.Ct. at 1770, and after discussing the procedural progression, stated:

The second step of this process [the *Batson* process] does not demand an explanation that is persuasive, *or even plausible.* "At this [second] step ... the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez* [at 360] 111 S.Ct. at [1866] (plurality opinion)....

*Id.* at ——, 115 S.Ct. at 1771 (emphasis added, some brackets in original). The Supreme Court continued:

The Court of Appeals [for the Eighth Circuit] erred by combining *Batson* 's second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive, *i.e.,* a "plausible" basis for believing that "the person's ability to perform his or her duties as a juror" will be affected....

The Court of Appeals appears to have seized on our admonition in *Batson* that to rebut a prima facie case, the proponent of a strike "must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges" ... and that the reason must be "related to the particular case to be tried".... What it means by a

"legitimate reason" *is not a reason that makes sense,* but a reason that does not deny equal protection.

*Id.* (emphasis added and citations omitted).

Prior to *Purkett,* the Supreme Court, in *Hernandez v. New York, supra,* 500 U.S. 352, 111 S.Ct. 1859, had forecast the direction in which it intended that *Batson* evolve. The *Hernandez* opinion, authored by Justice Kennedy, and joined by Chief Justice Rehnquist (a dissenter in *Batson* ) and Justices White and Souter, noted the three-step *Batson* process stating, in part:

> Second ... the burden shifts to the prosecutor to articulate a race-neutral explanation.... Finally, the trial court must determine whether *the defendant* has carried his burden of proving purposeful discrimination.

*Id.* at 358, 111 S.Ct. at 1866 (emphasis added). The Court explained what it had meant by the term "neutral":

> A neutral explanation ... means ... based on something other than the race of the juror.... [T]he issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.
>
> . . . .
>
> ... While the prosecutors's criterion might well result in the disproportionate removal of prospective Latino[6] jurors, that disproportionate impact does not turn the prosecutor's actions into a *per se* violation of the Equal Protection Clause.
>
> . . . .
>
> ... [D]isparate impact should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent, but it will not be conclusive in the preliminary race-neutrality step of the *Batson* inquiry.... Unless the government actor adopted a criterion with the intent of

---

6. *See Mejia v. State,* 90 Md.App. 31, 599 A.2d 1207 *vacated,* 328 Md. 522, 616 A.2d 356 (1992).

causing the impact asserted, that impact itself does not violate the principle of race neutrality....

. . . .

The trial judge ... chose to believe the prosecutor's race-neutral explanation ... rejecting ... assertion[s] that the reasons were pretextual. In *Batson,* we explained that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal.... *Batson*'s treatment of intent ... as a pure issue of fact, subject to review under a deferential standard, accords with our treatment of that issue in other equal protection cases....

... As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

. . . .

... The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that has been settled, *there seems nothing left to review.*

*Id.* at 360–67, 111 S.Ct. at 1866–70 (citations omitted and emphasis added).

The concurrence of Justice O'Connor, joined by Justice Scalia, further discussed the matter of the disproportionate impact of peremptory strikes:

[A] rule that disproportionate effect might be sufficient for an equal protection violation in the use of peremptory strikes runs the serious risk of turning *voir dire* into a full-blown disparate impact trial.... Absent intentional discrimination ... parties should be free to exercise their peremptory strikes for any reason, or no reason at all....

... No matter how closely tied or significantly correlated to race the explanation ... may be, the strike does not implicate the Equal Protection Clause unless it is based on race....

> ... [I ]f ... the trial court believes the prosecutor's nonracial justification, and that finding is not clearly erroneous, that is the end of the matter.

Id. at 374–75, 111 S.Ct. at 1874–75 (emphasis added).

In the case *sub judice*, Judge Sybert, in denying appellant's *Batson* challenge, accepted appellee's reasons. The reasons given are facially race-neutral. "[T]here seems nothing left to review." That, in a substantive sense, "is the end of the matter." *Id.*

In a practical sense, if, after the party opposing the strike has presented a *prima facie* showing, the proponent thereof proffers a facially neutral reason *that is accepted by the trial court,* then an appeal on *Batson* principles has little, if any, chance of success, given that the credibility of the proponent offering the reasons is, as it is generally, for the trial court— not an appellate court—to determine.

Thus, the inevitable result of *Purkett*'s holding (and that of *Hernandez*) is that *Batson* issues will generally be more viable on appeal in two somewhat limited instances: (1) when a proponent of a strike admits that he has exercised it for an improper discriminatory reason (such an admission would be rare indeed), yet prevails upon the trial court not to negate the discriminatory strike (an equally rare instance, we would hope), or (2) when a trial court rejects a facially neutral reason on the grounds it is pretexual, or on other grounds. But, as we suggest above, *Purkett* extends great deference to a trial court's *acceptance* (as opposed to rejection) of facially neutral reasons. In so doing, *Purkett* has placed, properly we believe, the trial court, not the appellate court, in the forefront of the resolution of *Batson* issues.

## The Gender Issue

When appellant at the trial below asserted a *Batson* objection, she, as we have noted, only proffered, "I am going to object to defense counsel striking Juror number thirteen ... who I assert was stricken solely because of her race." A *Batson* hearing was then held. Appellee's reasons were stat-

ed and appellant was given every opportunity to address those reasons and did so. At the conclusion of the *Batson* hearing, after the trial court overruled the objection, appellant stated: "I'm going to put one more thing on the record, ... all of his strikes were of women." Nothing else occurred.

In *Johnson v. Nadwodny,* 55 Md.App. 227, 238, 461 A.2d 67 (1983), appellant made a motion for continuance at the trial level upon which no ruling was made. We held:

> [T]he judge did not expressly deny the motion and procedurally we find that the judge was never asked to rule upon the motion.... [I]t is the responsibility of the movant to bring them to the attention of the trial judge prior to the conclusion of the trial.... [W]e ... consider that she has waived her rights to have a ruling on it.

In the case *sub judice,* appellant initially objected and raised a race-based *Batson* objection; she did not raise a gender-based objection. The *Batson* hearing was held, and the objection was overruled. For the purposes of that *Batson* hearing, appellant waived any gender-based objection for failure to raise it.

Moreover, even if we were to hold (and we expressly do not) that the various categories of *Batson* classes, can, on the same evidence, be addressed in a *seriatim* fashion by raising each classification separately after the previous objection is overruled, there are three reasons why appellant cannot prevail here. First, she raised no gender-based *Batson* objection in the first instance. After a *Batson* hearing is concluded, the following statement, "I'm going to put one more thing on the record, ... all of his strikes were of women," is not, without more, elevated to a *Batson* objection. No argument was made and reason given during the *Batson* hearing based upon gender. It was, therefore, waived and the statements thereafter proffered were not sufficient to revive the issue. Second, even if they were sufficiently raised, the trial court held no hearing and made no ruling for us to review. More important, because appellant did not direct the trial court's attention to the need, if any, for a hearing or a ruling,

the issue is thus waived. Finally, even if preserved, appellant's current objection would ultimately fail. The trial court accepted appellee's reasons for striking juror number thirteen. Those reasons, in addition to being facially race-neutral, are facially gender-neutral as well.[7] Under *Purkett,* we would have to defer to the trial court's acceptance of the reasons.

We perceive no error.

### 3.

**Did the trial court err in refusing to preclude the mentioning of or evidence of the fact that Appellant was suing the estate of her late sister?**

This issue has also been waived. It was raised initially in a pretrial motion *in limine.* That motion requested that appellee not be permitted to present evidence that appellant was suing the estate of her deceased sister. The motion was denied. In order to preserve an objection raised in a motion *in limine,* generally, an objection to the introduction of the objected-to testimony must be made when it is introduced at trial. *See Hunt v. State,* 321 Md. 387, 583 A.2d 218 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991); *Prout v. State,* 311 Md. 348, 535 A.2d 445 (1988); *Hickman v. State,* 76 Md.App. 111, 543 A.2d 870 (1988). In the case *sub judice,* appellant herself introduced that evidence to which she now objects. Moreover, even if its admission at trial was error, it was harmless error in that the jury had been informed of the parties' relationships during *voir dire.*

We perceive no prejudicial error.

### 4.

**Did the trial court abuse its discretion by restricting Appellant's cross[-]examination of Appellee's expert witness in regards to credibility, bias and prejudice?**

---

7. We do not address what would occur if a challenge is made that a strike is racial in nature and the reason given, though facially race-neutral, is not facially gender-neutral, *i.e.,* "I struck her because she was a woman, not because she was African American."

 Appellant managed to place into evidence much of what she asserts on appeal was denied to her. She was able to establish that the particular medical expert had testified in a number of cases for appellee's counsel's firm, "perhaps a few a month." During cross-examination, the expert testified that, in addition to the time spent examining the subject, he spent two and one-half hours preparing to testify. He also stated that he charged $250 an hour for out-of-court preparation and $350 per hour for court appearances, which was defined as all of the time from the time he left his office to testify until he returned. The expert also testified that he was asked by "numerous defense counsel" to examine patients and that his purpose in examining appellant was to respond to "defense counsel's request" and to be available to testify. He responded further, "Well, any interested party, plaintiff or defendant, it doesn't matter to me." He responded affirmatively when again asked, "You get two to five cases a month from Mr. Noble's office."

During appellant's proffer, he asserted to the trial court:

I want to show [he is] not an independent medical examiner, . . . I want to be able to show that what he actually is . . . is a paid employee of these defense lawyers . . . but . . . he gets involved in . . . dozens, and dozens, and dozens, of cases a year.

After the court told appellant's counsel that he had already established that, he replied to the court that he wanted to show that the work done for appellee's attorneys was just a small part of the expert's practice. The court responded, "Well, you can ask him does he get cases from other firms, but I'm not [going to] let you go into . . . another case where he took the stand and how many times. . . . Okay, let's go, we got to move on. . . ." Appellant then asked the expert if he had testified at the request of other lawyers. An objection was raised and the court then allowed the answer, questioning the witness itself:

THE COURT: Well, I allow it. You do . . . you do testimony for a lot of lawyers and a lot of firms.

[ANSWER]: ... I've come across a number of firms that have asked me to do it, yes.

Later, appellant asked the expert, without objection from appellee:

Q. Would you agree Doctor, that your opinion so far as it concerns an injured person who's referred to you by a ... one of the many defense lawyers is influenced by the fact that you were hired by that ... those defense lawyers.

A. No.

Upon our review of the record, appellant was afforded an ample opportunity to explore the matter of the expert's bias, and, moreover, took advantage of that opportunity. It was clear to the jury that the doctor had testified at the request of more than one law firm and that he had testified twenty-four to thirty-six times a year for appellee's law firm. Additionally, the evidence was sufficient for the jury to infer that the doctor spent up to five hours preparing for each appearance, at a rate of $250 an hour, and spent up to four or five hours proceeding to and from, waiting, and testifying at each occurrence, at the rate of $350 per hour. The jury could also clearly infer from the evidence admitted that the doctor might have made as much as $140,000 or more per year just from his association with appellee's counsel's firm.

The trial judge has discretion to control the scope of cross-examination. While cross-examination should not be improperly limited, we find neither abuse of discretion nor prejudicial error in the case *sub judice*.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**